## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | Case No. 18-18636-EEB |
| WPB HOSPITALITY, LLC | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |

## CREDITOR AMERICAN LENDING CENTER, LLC'S MOTION FOR RELIEF FROM STAY PURSUANT TO 11 U.S.C. § 362(d)(1)

Creditor American Lending Center, LLC ("Lender" or "ALC"), for its Motion for Relief for Stay Pursuant to 11 U.S.C. § 362(d)(1) (the "Motion"), states as follows:

### <u>INTRODUCTION</u>

This is a "bad faith" Chapter 11 Single Asset Real Estate case wherein all of the *Little Creek* factors are satisfied. Debtor filed this case the day before the foreclosure sale of the "single asset" was set to occur. Indeed, Debtor's counsel has conceded herein that the Petition was filed on a "rush" basis specifically to avoid the foreclosure. (Doc. # 18, ¶ 35.) Additionally, Debtor has no business operations, cash flow, receivables, contracts, or employees. (Doc. # 24, 26 and 28.) Instead, all Debtor has is partially constructed hotel that was to be completed over a year ago which has since been all but abandoned. Moreover, Debtor has failed to insure that property and left it exposed to the elements. Accordingly, Lender, who holds the senior lien on the property, is entitled to relief from the automatic stay.

## PARTIES, JURISDICTION AND VENUE

1.      Lender is a California limited liability company whose business address is 1 World Trade Center, Suite 1180, Long Beach, CA  90831.

2.      Debtor is a Colorado limited liability company whose business address is 5466 South Hannibal Court, Aurora, CO  80015.  On October 3, 2018 (the "Petition Date"), Debtor filed its voluntary petition (the "Petition") under Chapter 11 of Title 11, the United States Bankruptcy Code (the "Bankruptcy Code").  No trustee or statutory committee has been appointed, and Debtor is operating its business as a debtor-in-possession.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A.  The Construction Loan and Promissory Notes

4.      On or about December 31, 2015, Debtor and Lender entered into a Construction Loan Agreement (the "Loan Agreement") which contemplated a loan of $10,200,000 to Borrower (the "Loan").  (A copy of the Loan Agreement is attached hereto and incorporated herein as Exhibit 1.)  The purpose of the Loan was to finance Borrower's construction of a hotel at 16161 East 40th Avenue, Denver, CO  80239 (the "Hotel").  Pursuant to the Loan Agreement, construction of the Hotel was to be completed by September 18, 2017.

5.      In furtherance of the Loan, on or about December 31, 2015, Borrower made and delivered Promissory Note A in the original principal amount of $5,700,000 (the "A Note").  (A copy of the A Note is attached hereto and incorporated herein as Exhibit 2.)  Without limitation,

the A Note is in default for failure to make payments when due, failure to insure the Property, and as a result of Borrower's failure to complete construction of the Hotel in accordance with the Loan Agreement.  Lender is the holder of the A Note.  As of the Petition Date, the following amounts are due on the A Note:  principal in the amount of $500,615.02, interest in the amount of $11,659.32, and late charges in the amount of $582.97.  Interest continues to accrue at a variable rate.

6.      In furtherance of the Loan, on or about December 31, 2015, Borrower made and delivered Promissory Note B in the original principal amount of $4,500,000 (the "B Note")[1].  (A copy of the B Note is attached hereto and incorporated herein as Exhibit 3.)  Without limitation, the B Note is in default for failure to make payments when due, failure to insure the Property, and as a result of Borrower's failure to complete construction of the Hotel in accordance with the Loan Agreement.  Lender is the holder of the B Note.  As of the Petition Date, the following amounts are due on the B Note:  principal in the amount of $4,500,000.00, interest in the amount of $104,802.12, and late charges in the amount of $5,240.10.  Interest continues to accrue at a variable rate.

7.      The Notes each prohibit prepayment during the first five (5) years of their terms.

**B.  The Deed of Trust**

8.      Without limitation, in order to secure payment of the indebtedness evidenced by the Notes, Borrower made and delivered a Deed of Trust conveying certain real property located at 16161 East 40th Avenue, Denver, CO  80239 (the "Property") to the Public Trustee of Denver,

---

[1] The A Note and the B Note will be collectively referred to as the "Notes."

Colorado, for the benefit of Lender.  (A copy of the Deed of Trust is attached hereto and incorporated herein as Exhibit 4.)

### C.  The Security Agreement

9.      Without limitation, in order to secure payment of the indebtedness evidenced by the Notes, pursuant to a Security Agreement, Borrower granted Lender a security interest in its assets, including its furniture and equipment, and proceeds in the amount of $215,554.74 held in a pledged account (the "Collateral").  (A copy of the Security Agreement is attached hereto and incorporated herein as Exhibit 5.)

### D.  The Pre-Petition Defaults and Real Property Foreclosure

10.      Pursuant to the Loan Agreement, construction of the Hotel was to be completed by September 18, 2017 (the "Completion Deadline").  Debtor failed to complete construction of the Hotel by the Completion Deadline.  Construction on the Hotel ceased in the fall of 2017 and currently remains approximately 34% complete.  Pictures of the Hotel, taken in July 2018, are attached hereto as Exhibit 6.  Without limitation, Debtor is in default of the Loan for failure to complete construction of the Hotel by the Completion Deadline.

11.      Debtor ceased making payments on the Notes in November of 2017.  The failure to make payments when due constituted an event of default.

12.      On March 30, 2018, Lender initiated a foreclosure of the Deed of Trust with the Public Trustee for the City and County of Denver, Colorado (the "Foreclosure").  Lender alleged that Debtor defaulted by failing to make payments when due and failing to comply with the terms of the Loan Agreement.  The Foreclosure was assigned Sale No. 2018-000146 by the Public Trustee.

13.    In furtherance of the Foreclosure, Lender initiated a C.R.C.P. 120 proceeding in the District Court for the City and County of Denver, Colorado, to obtain an Order Authorizing Sale (the "Rule 120 Proceeding").  Debtor objected to the issuance of an Order Authorizing Sale and an evidentiary hearing was held in the Rule 120 Proceeding on July 27, 2018.  The day before the evidentiary hearing, the monetary default was cured by the payment, the delinquent interest, and late fees due on the Notes (the "Cure Funds").

14.    The Cure Funds were not paid by Debtor.  Instead, the Cure Funds were paid by Alpine Hospitality, Inc.  ("Alpine").  (Exhibit 7, Wire Confirmation.)  According to Debtor's schedules, Alpine is Debtor's largest unsecured creditor.  (Doc. # 27.)  Also, Alpine is owned by the same individual that owns Debtor, Wanda Bertoia ("Ms. Bertoia").

15.    Despite payment of the Cure Funds, the parties proceeded with the Rule 120 hearing on whether Debtor defaulted by failing to complete construction by the Construction Deadline.  During the course of the evidentiary hearing, Lender and Debtor reached a resolution that contemplated, *inter alia*, Debtor being given a period of four (4) weeks to complete an alleged refinance of the Loan (with another lender) in exchange for Debtor consenting to an Order Authorizing Sale.  The resolution was read on the record during the evidentiary hearing.  However, after the Rule 120 hearing, Debtor refused to sign the settlement agreement and its alleged refinance apparently fell through.  Thereafter, the Court in the Rule 120 Proceeding determined that the parties did not agree on all material terms and therefore an enforceable settlement agreement was not reached.  However, the Court did find that Borrower was in default on the Deed of Trust and that an Order Authorizing was warranted.  On September 21, 2018, the Court entered an Order Authorizing Sale.  (Exhibit 8, Order Authorizing Sale.)

16.     After the Order Authorizing Sale was entered, the Public Trustee scheduled the foreclosure sale for October 4, 2018.  (Exhibit 9, Public Trustee Summary.)

17.     Debtor hired bankruptcy counsel "late" on October 2, 2018 and filed its Petition on October 3, 2018, specifically to avoid the foreclosure sale.  (Doc. # 18, ¶¶ 12 and 35.)

### E.  Debtor's Petition and Failure to Insure the Property

18.     Debtor concedes in its Petition that this is a Single Asset Real Estate bankruptcy, as defined in 11 U.S.C. § 101(51B).  (Petition, ¶ 7.)  That "single asset" is the Property on which the partially constructed Hotel is situated.  (Petition, ¶ 12.)

19.     According to Debtor's Petition, the Property is not insured.  (Petition, ¶ 12.)  The Loan Agreement affirmatively requires Debtor to insure the Property.  (Exhibit 1.)  Debtor's failure to do so constitutes an event of default and lack of adequate protection.

20.     Pursuant to 11 U.S.C. § 1112(b)(4)(C), failure to maintain appropriate insurance constitutes cause for dismissal or conversion.

### RELIEF REQUESTED

21.     Lender requests that this Court enter an order granting it relief from the automatic stay as to the Property and Business Assets under 11 U.S.C. § 362(d)(1).

### BASIS FOR RELIEF REQUESTED

### A.     Debtor's Single Asset Bankruptcy Petition Was Filed in Bad Faith

22.     Section 362(d)(1) of the Bankruptcy Code permits a party in interest, after notice and a hearing, to seek relief from the automatic stay for "cause."   *See* 11 U.S.C. § 362(d)(1); *In re JE Livestock, Inc.*, 375 B.R. 892, 897 (B.A.P. 10th Cir. 2007) ("While cause under § 362(d)(1) includes 'the lack of adequate protection of an interest in property,' it is not so limited. . . Because

6

'cause' is not further defined in the Bankruptcy Code, relief from stay for cause is a discretionary determination made on a case by case basis.").

23.     The Tenth Circuit Court of Appeals has recognized that a bankruptcy case that is filed in bad faith can serve as independent "cause" for purposes of Section 362(d)(1).  *See In re Nursery Land Development, Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996); *Pacific Rim Invs., LLP v Oriam, LLC (In re Pacific Rim Invs., LLP)*, 243 B.R. 768 (D. Colo. 2000).  In the context of Single Asset Real Estate Cases, "[f]indings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum."  *In re Platte River Bottom, LLC*, 2016 Bankr. LEXIS 186 at *27-28 (Bankr. D. Colo. 2016) (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73) (5th Cir. 1986)).  The following non-exclusive "conglomerate of factors" are applied to determine whether a single asset real estate debtor has filed its case in bad faith:

> (i) the debtor has one asset, such as a tract of undeveloped or developed real property; (ii) the secured creditor's liens encumber the tract; (iii) there are generally no employees except for the principals; (iv) there is little to no cash flow; (v) there are no available sources of income to sustain a plan of reorganization or to make adequate protection payments; (vi) there are only a few, if any, unsecured creditors whose claims are relatively small; (vii) the property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court; and (viii) the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford.

*In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986).

24.     In addition to the *Little Creek* factors, another division of this Court has stated that the following are relevant for purposes of a bad faith failing: (a) the debtor has no ongoing business; and (b) the Chapter 11 filing stopped the foreclosure.  *In re Gunnison Ctr. Apts.*, LP, 320 B.R. 391, 399 (Bankr. D. Colo. 2005) (citing *Nursery Land Development, Inc.*, 91 F.3d at 1416)).

7

Furthermore, when a specific purpose of the bankruptcy filing is to "frustrate" a creditor's legitimate foreclosure action, bad faith is present. *Nursery Land Development, Inc.*, 91 F.3d at 1416. "Bad faith is found when the cumulative effect of these or other factors leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate." *In re H.T. Pueblo Props., LLC*, 2011 Bankr. LEXIS 5231, at *11-12 (Bankr. D. Colo. Dec. 30, 2011).

25.     As explained below, virtually all indicia of bad faith exist under the *Little Creek* factors and the *Nursery Land* factors. Accordingly, the Court should grant relief from the automatic stay, pursuant to Section 362(d)(1) of the Bankruptcy Code, because "cause" exists when reviewing the cumulative effect of all relevant factors.

(i)     Debtor's Only Meaningful Asset is the Property Which is Encumbered by Lender's First Position Deed of Trust.

26.     There is no dispute that Debtor's only meaningful asset is the Property and that Lender holds the first position lien on the Property. Accordingly, the first and second *Little Creek* factors weigh in favor of a finding of bad faith.

(ii)     Debtor has No Employees and Generates No Cash Flow.

27.     As reflected in Debtor's Statement of Financial Affairs, Debtor has no revenue. (Doc. # 24.) Similarly, as evidenced by Debtor's Summary of Assets and Liabilities, Debtor has no accounts receivable. (Doc. # 26.) Given that Debtor has no cash flow, it is apparent that Debtor has no employees, other than its principals.

28.     Accordingly, the third and fourth *Little Creek* factors weigh in favor of a finding of bad faith.

(iii)   <u>There are no Available Sources of Income to Sustain a Plan of Reorganization or to Make Adequate Protection Payments.</u>

29.   Given the absence of cash flow or accounts receivable, there are no sources of income to sustain a plan of reorganization or make adequate protection payments.  Indeed, Debtor itself was unable to pay the Cure Funds.  Again, those funds came from Alpine, which is Debtor's largest unsecured creditor and another company owned by Debtor's owner, Ms. Bertoia.  (<u>Exhibit 7</u>.)  Similarly, Ms. Bertoia, not Debtor, paid counsel for Debtor's retainer herein.  (Doc. # 18, ¶ 15.)  Accordingly, the fifth *Little Creek* factor weighs in favor of a finding a bad faith.

(iv)   <u>Debtor has Few Unsecured Creditors.</u>

30.   Apart from Alpine, Debtor has few unsecured creditors.  Indeed, those creditors are unpaid subcontractors and suppliers related to the failed construction of the Hotel.

(v)   <u>After Unsuccessfully Defending the Foreclosure in State Court, Debtor Filed its Petition on the Eve of the October 4, 2018 Foreclosure Sale.</u>

31.   As detailed above, Debtor was unsuccessful in the Rule 120 Proceeding.  Ultimately, the Court entered an Order Authorizing Sale on September 21, 2018.  (<u>Exhibit 8</u>.)  Then, with the foreclosure sale set for October 4, 2018, Debtor filed its Petition herein on October 3, 2018.  In its Application to Employ, counsel for Debtor reported:  "this bankruptcy was a rush filing to avoid a Public Trustee Foreclosure on October 14, 2018."  (Doc. # 18, ¶ 35.)  Further evidencing that this single asset bankruptcy was filed in bad faith, is the admission that Debtor's bankruptcy counsel was retained "late on Tuesday, October 2, 2018," the day before the Petition was filed.  (Doc. #18, ¶ 12.)  Accordingly, the seventh and eighth *Little Creek* factors weigh in favor of a finding of bad faith.  *See also In re Gunnison Ctr. Apts.*, LP, 320 B.R. 391, 399 (Bankr. D. Colo. 2005) (*citing Nursery Land Development, Inc.*, 91 F.3d at 1416)).

9

(vi)     Debtor has no Current Business Operations to Reorganize.

32.      "Bad faith is commonly found in single asset cases involving debtors with no current business operations to reorganize."  *In re Platte River Bottom, LLC*, 2016 Bankr. LEXIS 186, at *26 (Bankr. D. Colo. 2016); *In re Pacific Rim Investments, LLP*, 243 B.R. 768 (D. Colo. 2000) (Debtor, which owned an office building, filed bankruptcy petition to avoid adverse outcome of state court litigation. Bad faith found even though debtor had equity in the asset and had filed a plan.).

33.      As evidenced by Debtor's schedules, Debtor has no business operations.  Debtor has no cash flow, accounts receivable, or executory contracts.  (Doc. # 24, 26, and 28.)  Debtor simply has a partially constructed Hotel on which construction has been abandoned for approximately one (1) year.  Moreover, Debtor has *allegedly* made several efforts to refinance the Loan (through other lenders), to no avail.[2]  Accordingly, Debtor has no current business operations to reorganize.

(vii)     Debtor's Failure to Insure the Property is Further Evidence of Bad Faith.

34.      In its Petition, Debtor admitted that the Property is not insured.  (Petition, ¶ 12.) Pursuant to 11 U.S.C. § 1112(b)(4)(C), failure to maintain appropriate insurance constitutes cause for dismissal or conversion.

## B.     Summary – The Petition is a Bad Faith Filing

35.      As stated in *Little Creek*, when several of the identified "conglomerate of factors" exist:

---

[2] Whether Debtor has actually attempted to refinance is called in to question by Debtor's schedules.  Indeed, Debtor has not issued a financial statement to any financial institution, creditor or other party in the last two (2) years.  (Doc. # 24.)

> Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's "terminal euphoria." The Sixth Circuit in *Winshall Settlor's Trust*, 758 F.2d 1136, 1137, aptly noted that "the purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." *See In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 922 (Bankr.N.D.Ill. 1982). "If there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre. . . .*" *In re Ironsides, Inc.*, 34 B.R. 337, 339 (Bankr. W.D.Ky. 1983). Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions.

*Little Creek*, at 1073.

36.    Here, effectively all of the Little Creek factors are present.  The Hotel has been sitting for about a year with no construction progress, Debtor has no business operations or cash flow, it has not insured the Property, and it filed its Petition herein in an admitted effort to stall the foreclosure sale.  Accordingly, stay relief must be granted.

### C.    Lender Lacks Adequate Protection

37.    The Loan Agreement affirmatively requires Debtor to insure the Property.  (Exhibit 1.)  Debtor's admitted failure to do so constitutes an event of default and lack of adequate protection.

38.    Additionally, the abandoned construction leaves the partially built Hotel exposed to the elements, with winter rapidly approaching.  (Exhibit 6.)

39.    Moreover, since Alpine paid Cure Funds in July 2018, no further payments have been made to Lender.  Indeed, according to Debtor's schedules, it lacks any cash flow whatsoever to make adequate protection payments.

40.    For these reasons, and without limitation, Lender lacks reasonable protection and it entitled to relief from the automatic stay. 11 U.S.C. § 362(d)(1).

WHEREFORE, Lender respectfully requests this Honorable Court enter an Order granting Lender relief from the automatic stay for "cause" pursuant to Section 362(d)(1) of the Bankruptcy Code, and for such other and further relief this Court deems just and proper under the circumstances.

**Dated:**        Denver, Colorado.
              October 18, 2018

                                      MOYE WHITE LLP

                                      s/ *David A. Laird*
                                      David A. Laird, #31067
                                      Moye White LLP
                                      1400 16th Street, 6th Floor
                                      Denver, Colorado 80202
                                      Email: david.laird@moyewhite.com
                                      Phone:  (303) 292-2900
                                      Fax:      (303) 292-4510

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2018, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of such filing to all parties receiving electronic notice from the Court's CM/ECF system, and *via* first class mail on the parties identified below and all parties identified on the attached Debtor's Creditors' Matrix as of October 18, 2018.

*s/ Lisa Oliver*

| | |
|---|---|
| **Debtor** | represented by **Arthur Lindquist-Kleissler** |
| **WPB Hospitality, LLC** | 950 S. Cherry St. |
| 5466 S Hannibal Ct | Ste. 418 |
| Aurora, CO 80015-4282 | Denver, CO 80246 |
| ARAPAHOE-CO | 303-691-9774 |
| Tax ID / EIN: 27-0223459 | Fax : 303-200-8994 |
| | Email: Arthuralklaw@gmail.com |
| | |
| **U.S. Trustee** | represented by **Alan K. Motes** |
| **US Trustee** | Byron G. Rogers Federal |
| Byron G. Rogers Federal Building | Building |
| 1961 Stout St. | 1961 Stout St. |
| Ste. 12-200 | Ste. 12-200 |
| Denver, CO 80294 | Denver, CO 80294 |
| 303-312-7230 | 303-312-7999 |
| | Email: Alan.Motes@usdoj.gov |

**Creditor's Matrix**

Bing Sellers
3879 E. 120th Ave. #345
Thornton, CO 80233-1658

Colorado Dept. of Revenue
Attn: Bankruptcy Department
1375 Sherman St.
Denver, CO 80261-3000

U.S. Bankruptcy Court
US Custon House
721 19th Street
Denver, CO 80202-2508

Colorado Department of Revenue
1375 Sherman St., Room 504
Attn: Bankruptcy Unit
Denver, CO 80261-3000

IRS
P.O. Box 7346
Philadelphia, PA 19101-7346

Alpine Hospitality
6210 Tower Rd.
Denver, CO 80249-6703

HD Supply
10000 E. 56th Ave., Unit 130
Denver, CO 80238-3899

O'Brien Concrete Pumping Colorado
4388 S. Windmere St.
Englewood, CO 80110-5539

Colorado Attorney General
1300 N. Broadway, Fl. 10
Denver, CO 80203-2104

Rio Grande Company
201 Santa Fe Dr.
Denver, CO 80223-1328

Securities and Exchange Commission
Central Regional Office
1961 Stout St., Ste. 1700
Denver, CO 80294-1700

Denver County Public Trustee
201 W. Colfax Ave.
Denver, CO 80202-5330

Summit Services Group, LLC
15690 E. 53rd Ave.
Aurora, CO 80011

US Trustee
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO 80294-6004

Metro Building Products, Inc.
2115 S. Valentia St.
Denver, CO 80231-3324

Urban West Construction, LLC
3155 E. 104th Ave., Unit 8E
Thornton, CO 80233-4215

Arthur Lindquist-Kleissler
950 S. Cherry St., Ste. 418
Denver, CO 80246-2662

Redd Iron, Inc.
Atkins, David
10421 E. 106th Ave.
Brighton, CO 80601-7177

Aileron Investment Management, LLC
3410 W. Cypress St., Ste 101
Tampa, FL 33607-5008

United Rentals North Am. Inc.
6125 Lakeview Rd., Ste 300
Charlotte, NC 28269-2616

Securities and Exchange Commission
Midwest Regional Office
175 W. Jackson Blvd., Ste 900
Chicago, IL 60604-2815

City and County of Denver
Treasury Division
P.O. Box 17420
Denver, CO 80217-0420

WPB Hospitality, LLC
5466 S. Hannibal Ct.
Aurora, CO 80015-4282

Am Lending Center, LLC
1 World Trade Ctr., Ste 1180
Long Beach, CA 90831-0023

Moye White LLP
1400 16th St., 6th Fl.
Denver, CO  80202

# CONSTRUCTION LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $10,200,000.00 | 12-31-2015 | 01-01-2028 | 1016 | | | 155 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** WPB Hospitality, LLC, a Colorado limited liability
company
5466 S. Hannibal Court
Centennial, CO 80015

**Lender:** American Lending Center, LLC, a California limited
liability company
1 World Trade Center
Suite 1180
Long Beach, CA 90831

THIS CONSTRUCTION LOAN AGREEMENT dated December 31, 2015, is made and executed between WPB Hospitality, LLC, a Colorado limited liability company ("Borrower") and American Lending Center, LLC, a California limited liability company ("Lender") on the following terms and conditions. Borrower has applied to Lender for one or more loans for purposes of constructing the Improvements on the Real Property described below. Lender is willing to lend the loan amount to Borrower solely under the terms and conditions specified in this Agreement and in the Related Documents, to each of which Borrower agrees. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, and (B) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of December 31, 2015, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until January 1, 2028.

**LOAN.** The Loan shall be in an amount not to exceed the principal sum of U.S. $10,200,000.00 and shall bear interest on so much of the principal sum as shall be advanced pursuant to the terms of this Agreement and the Related Documents. The Loan shall bear interest on each Advance from the date of the Advance in accordance with the terms of the Note. Borrower shall use the Loan Funds solely for the payment of: (A) the costs of constructing the Improvements and equipping the Project in accordance with the Construction Contract; (B) other costs and expenses incurred or to be incurred in connection with the construction of the Improvements as Lender in its sole discretion shall approve; and (C) if permitted by Lender, interest due under the Note, including all expenses and all loan and commitment fees described in this Agreement. The Loan amount shall be subject at all times to all maximum limits and conditions set forth in this Agreement or in any of the Related Documents, including without limitation, any limits relating to loan to value ratios and acquisition and Project costs.

**PROJECT DESCRIPTION.** The word "Project" as used in this Agreement means the construction and completion of all Improvements contemplated by this Agreement, including without limitation the erection of the building or structure on the Real Property identified to this Agreement by Borrower and Lender, installation of equipment and fixtures, landscaping, and all other work necessary to make the Project usable and complete for the intended purposes.

The word "Property" as used in this Agreement means the Real Property together with all Improvements, all equipment, fixtures, and other articles of personal property now or subsequently attached or affixed to the Real Property, together with all accessions, parts, and additions to, all replacements of, and all substitutions for any of such property, and all proceeds (including insurance proceeds and refunds of premiums) from any sale or other disposition of such property. The real estate described below constitutes the Real Property as used in this Agreement.

The real estate legally described as:
A parcel of land being a portion of Plot 1, Block 1, Gateway Park IV - Denver Filing No. 7, being more particularly described as follows:
COMMENCING at the northwest corner of said Plot 1;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 295.63 feet to the true point of beginning;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 396.64 feet to the northeast corner of said Plot 1;
THENCE the following three (3) course along the East line of said Plot 1:
1. THENCE South 10 degrees 26 minutes 16 seconds West, a distance of 95.82 feet to a point of curve;
2. THENCE along the arc of a curve to the left, having a central angle of 10 degrees 34 minutes 10 seconds, a radius of 315.00 feet and an arc length of 58.11 feet;
3. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 307.25 feet to the southeast corner of said Plot 1;
THENCE the following four (4) courses along the South line of said Plot 1:
1. THENCE South 89 degrees 52 minutes 06 seconds West, a distance of 100.00 feet;
2. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 5.00 feet to a point on the North right-of-way line of 40th Avenue, as dedicated by 40th Avenue, Chambers Road - Pena Boulevard Subdivision, recorded May 6, 1997, at Reception Number 9700057406, said City and County of Denver Records;
3. THENCE South 89 degrees 52 minutes 06 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 250.09 feet;
4. THENCE South 89 degrees 52 minutes 04 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 23.63 feet;
THENCE North 00 degrees 07 minutes 54 seconds West, a distance of 464.23 feet to the true point of beginning, City and County of Denver, State of Colorado.
Its address is commonly known as:
Real Property located at 16161 E. 40th Avenue, Denver, CO 80239.

**FEES AND EXPENSES.** Whether or not the Project shall be consummated, Borrower shall assume and pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including without limitation the following: (A) all closing costs, loan fees, and disbursements; (B) all expenses of Lender's legal counsel; and (C) all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**NO CONSTRUCTION PRIOR TO RECORDING OF SECURITY DOCUMENT.** Borrower will not permit any work or materials to be furnished in connection with the Project until (A) Borrower has signed the Related Documents; (B) Lender's mortgage or deed of trust and other Security Interests in the Property have been duly recorded and perfected; (C) Lender has been provided evidence, satisfactory to Lender, that Borrower has obtained all insurance required under this Agreement or any Related Documents and that Lender's liens on the Property and Improvements are valid perfected first liens, subject only to such exceptions, if any, acceptable to Lender.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Exhibit 1

# CONSTRUCTION LOAN AGREEMENT
## (Continued)

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Colorado. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 5468 S. Hannibal Court, Centennial, CO 80015. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:

| Borrower | Assumed Business Name | Filing Location | Date |
|---|---|---|---|
| WPB Hospitality, LLC, a Colorado limited liability company | Best Western Premier DIA | Colorado Secretary of State | 11-27-2015 |

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower, do not require the consent or approval of any other person, regulatory authority, or governmental body, and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties. Borrower has the power and authority to enter into the Note and the Related Documents and to grant collateral as security for the Loan. Borrower has the further power and authority to own and to hold all of Borrower's assets and properties, and to carry on Borrower's business as presently conducted.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
## (Continued)

| Loan No: 1016 | | Page 3 |
|---|---|---|

terms.

**Employee Benefit Plans.**  Each employee benefit plan as to which Borrower may have any liability complies in all material respects with all applicable requirements of law and regulations, and  (1)  no Reportable Event nor Prohibited Transaction (as defined in ERISA) has occurred with respect to any such plan,  (2)  Borrower has not withdrawn from any such plan or initiated steps to do so,  (3)  no steps have been taken to terminate any such plan or to appoint a trustee to administer such a plan, and  (4)  there are no unfunded liabilities other than those previously disclosed to Lender in writing.

**Investment Company Act.**  Borrower is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

**Public Utility Holding Company Act.**  Borrower is not a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

**Regulations T and U.**  Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).

**Information.**  All information previously furnished or which is now being furnished by Borrower to Lender for the purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all information furnished by or on behalf of Borrower to Lender in the future will be, true and accurate in every material respect on the date as of which such information is dated or certified; and no such information is or will be incomplete by omitting to state any material fact the omission of which would cause the information to be misleading.

**Claims and Defenses.**  There are no defenses or counterclaims, offsets or other adverse claims, demands or actions of any kind, personal or otherwise, that Borrower, any Grantor, or any Guarantor could assert with respect to the Note, Loan, this Agreement, or the Related Documents.

**Title to Property.**  Borrower has, or on the date of first disbursement of Loan proceeds will have, good and marketable title to the Collateral free and clear of all defects, liens, and encumbrances, excepting only liens for taxes, assessments, or governmental charges or levies not yet delinquent or payable without penalty or interest, and such liens and encumbrances as may be approved in writing by the Lender.  The Collateral is contiguous to publicly dedicated streets, roads, or highways providing access to the Collateral.

**Project Costs.**  The total cost for the Project shall not exceed $19,366,527.00.  The Project costs are true and accurate estimates of the costs necessary to complete the Improvements in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the Improvements from exceeding the Project costs.

**Utility Services.**  All utility services appropriate to the use of the Project after completion of construction are available at the boundaries of the Collateral.

**Assessment of Property.**  The Collateral is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

**Compliance with Governing Authorities.**  Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Project.  The Project will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

**Survival of Representations and Warranties.**  Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents.  Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**CONDITIONS PRECEDENT TO EACH ADVANCE.**  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Special Conditions to Initial Advance.**  Subject to receipt of and compliance with Tetra Tech Construction Completion Commitment.  Tetra Tech to provide funds control and draw disbursements during construction.

**Equity Funds.**  Borrower shall provide evidence of equity funds totaling **$4,291,527.00** prior to the initial advance from the Loan Fund.  Lender may, at Lender's option, require that the equity funds be deposited with Lender as a portion of the Loan Fund, which funds shall be disbursed prior to any Loan proceeds.

**Required Collateral.**  (1) All Furniture, Fixtures and Equipment (as each term is defined in the UCC); whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing located on, used in connection with or otherwise associated with, the real property described herein which is commonly known as 16161 E. 40th Avenue, Denver, CO; (2) certain cash proceeds in the original amount of $215,554.75 and any interest derived therefrom held in a pledged account with Northeast Bank pursuant to an account pledge agreement executed in connection herewith.

**Approval of Contractors, Subcontractors, and Materialmen.**  Lender shall have approved a list of all contractors employed in connection with the construction of the Improvements, showing the name, address, and telephone number of each contractor, a general description of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, and the approximate dollar value of the labor, work, or materials with respect to each contractor or materialman.  Lender shall have the right to communicate with any person to verify the facts disclosed by the list or by any application for any Advance, or for any other purpose.

**Plans, Specifications, and Permits.**  Lender shall have received and accepted a complete set of written Plans and Specifications setting forth all Improvements for the Project, and Borrower shall have furnished to Lender copies of all permits and requisite approvals of any governmental body necessary for the construction and use of the Project.

**Architect's and Construction Contracts.**  Borrower shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

Exhibit 1

# CONSTRUCTION LOAN AGREEMENT
## (Continued)

**Related and Support Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following support documents for the Loan: Assignment of Architect's Contract, Assignment of Construction Contract and Completion Guaranty.

**Budget and Schedule of Estimated Advances.** Lender shall have approved detailed budget and cash flow projections of total Project costs and a schedule of the estimated amount and time of disbursements of each Advance.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the consummation of the Project and duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Bond.** If requested by Lender, Borrower shall have furnished a performance and payment bond in an amount equal to 100% of the amount of the Construction Contract, as well as a materialmen's and mechanics' payment bond, with such riders and supplements as Lender may require, each in form and substance satisfactory to Lender, naming the General Contractor as principal and Lender as an additional obligee.

**Appraisal.** If required by Lender, an appraisal shall be prepared for the Property, at Borrower's expense, which in form and substance shall be satisfactory to Lender, in Lender's sole discretion, including applicable regulatory requirements.

**Plans and Specifications.** If requested by Lender, Borrower shall have assigned to Lender on Lender's forms the Plans and Specifications for the Project.

**Environmental Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expense, an environmental report and certificate on the Property in form and substance satisfactory to Lender, prepared by an engineer or other expert satisfactory to Lender stating that the Property complies with all applicable provisions and requirements of the "Hazardous Substances" paragraph set forth in this Agreement.

**Soil Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expenses, a soil report for the Property in form and substance satisfactory to Lender, prepared by a registered engineer satisfactory to Lender stating that the Property is free from soil or other geological conditions that would preclude its use or development as contemplated without extra expense for precautionary, corrective or remedial measures.

**Survey.** If requested by Lender, Borrower shall have furnished to Lender a survey of recent date, prepared and certified by a qualified surveyor and providing that the Improvements, if constructed in accordance with the Plans and Specifications, shall lie wholly within the boundaries of the Collateral without encroachment or violation of any zoning ordinances, building codes or regulations, or setback requirements, together with such other information as Lender in its sole discretion may require.

**Zoning.** Borrower shall have furnished evidence satisfactory to Lender that the Collateral is duly and validly zoned for the construction, maintenance, and operation of the Project.

**Title Insurance.** Borrower shall have provided to Lender an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by a title insurance company acceptable to Lender and in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's security agreement or other security document on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by Lender in writing. If requested by Lender, Borrower shall provide to Lender, at Borrower's expense, a foundation endorsement (CLTA 102.5 or its equivalent) to the title policy upon the completion of each foundation for the Improvements, showing no encroachments, and upon completion an endorsement which insures the lien-free completion of the Improvements (CLTA 101 series, as required by Lender). Specifically, Borrower shall provide to Lender the following title insurance endorsements: **LP-10 Policy.**

**Insurance.** Unless waived by Lender in writing, Borrower shall have delivered to Lender the following insurance policies or evidence thereof: (a) an all risks course of construction insurance policy (builder's risk), with extended coverage covering the Improvements issued in an amount and by a company acceptable to Lender, containing a loss payable or other endorsement satisfactory to Lender naming Lender as mortgagee, together with such other endorsements as may be required by Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender; (b) owners and General Contractor general liability insurance, public liability and workmen's compensation insurance; (c) flood insurance if required by Lender or applicable law; and (d) all other insurance required by this Agreement or by the Related Documents.

**Workers' Compensation Coverage.** Provide to Lender proof of the General Contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Project.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Satisfactory Construction.** All work usually done at the stage of construction for which disbursement is requested shall have been done in a good and workmanlike manner and all materials and fixtures usually furnished and installed at that stage of construction shall have been furnished and installed, all in compliance with the Plans and Specifications. Borrower shall also have furnished to Lender such proofs as Lender may require to establish the progress of the work, compliance with applicable laws, freedom of the Property from liens, and the basis for the requested disbursement.

**Certification.** Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified inspector acceptable to Lender that the construction of the Improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations, and similar requirements.

**Lien Waivers.** Borrower shall have obtained and attached to each application for an Advance, including the Advance to cover final payment to the General Contractor, executed acknowledgments of payments of all sums due and releases of mechanic's and materialmen's liens, satisfactory to Lender, from any party having lien rights, which acknowledgments of payment and releases of liens shall cover all work, labor, equipment, materials done, supplied, performed, or furnished prior to such application for an Advance.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**DISBURSEMENT OF LOAN FUNDS.** The following provisions relate to the disbursement of funds from the Loan Fund.

**Application for Advances.** Borrower shall apply for Advances from the Loan Fund according to the following disbursement schedule: **Whenever Borrower wishes to draw down an Advance, they shall:**

**(1) comply with all requirements set forth in that certain Funds Control & Inspection Services Agreement With Completion Commitment issued by Tetra Tech, Inc. executed by Borrower in connection herewith, a copy of which is attached hereto as Exhibit "A" (the "Tetra Tech Agreement"); and**

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

**(2)** give notice (a "Drawdown Notice") to Lender which, to be effective, must be in writing and must be received by Lender not later than 10:00 a.m. (Long Beach, California time) two (2) business days prior to the proposed date of drawdown (a "Drawdown Date").

**Each Drawdown Notice shall specify:**

(a) the Drawdown Date which must be a business day in the State of California; and,

(b) the proposed amount of the Advance.

**Drawdown Notices.** Each Drawdown Notice shall be accompanied by:

(a) a progress certificate from a construction analyst or architect reasonably acceptable to Lender covering the amount of the Advance and describing both development and construction costs and costs of fixtures installed, consistent with the budgets shown in the Construction Contract and a cost breakdown.  Advances under the Loan will not exceed the amount certified as having been spent on development or construction.  In respect of architects fees, permit fees and other types of "soft costs", Lender will accept invoices covering budgeted expenses.  In the event that any amount is requested which represents an additional payment to the contractor because of savings on construction costs, any such amount(s) shall be separately stated on the Drawdown Notice and accompanied by a certification from the construction analyst or architect using AIA Forms G702 and G703, or such other form acceptable to Lender, that the goods or services actually supplied by the construction company are acceptable to such construction analyst or architect;

(b) evidence satisfactory to Lender reflecting that the proposed construction complies with all applicable zoning and building laws and regulations and that all licenses, permits and government approvals necessary for such use and construction have been obtained, also, that all environmental codes/regulations have been met and that the property is free from all contamination;

(c) a title update if requested by Lender;

(d) evidence of compliance with the EB-5 requirements attached to this Loan Agreement as Exhibit "B" if requested by Lender;

(e) instructions regarding the disposition of the particular Advance; and

(f) such other information regarding the Loan and the Project as Lender or its agent including but not limited to Tetra Tech may reasonably request.

Lender shall have no obligation to make any Advance under any such Drawdown Notice unless:  (1) the documents, certificates of surveyors and engineers and opinions required by Lender in connection with the Advance have been received by Lender along with the relevant Drawdown Notice, and have been found by Lender to be satisfactory in its reasonable discretion; (2) at the time when the Drawdown Notice is received by Lender and on the day and time for making the Advance referred to therein, the representations and warranties made by Borrower in the Loan Documents are true and accurate at such times respectively as if repeated then; (3) at the time when a Drawdown Notice is received by Lender and on the day and time for making the Advance referred to therein, Borrower shall have provided to Lender specific partial releases from all subcontractors, material suppliers or laborers who have received payments from any prior Advances; (4) Borrower is in compliance with all terms and conditions of the Tetra Tech Agreement; (5) the contractors and subcontractors used by Borrower remain reasonably acceptable to Lender; (6) at such time, no event shall have occurred, and be then-uncured, which is an Event of Default or which, with the giving of notice or the lapse of time, would constitute an Event of Default hereunder; (7) the Loan Documents and all transactions contemplated by the Loan Documents shall be in form and substance satisfactory to Lender, the security intended to be conferred thereby shall have been duly perfected and Lender shall have received such other documents, authorizations, resolutions, consents, licenses or opinions as it may reasonably request in relation to the Loan Documents; (8) the un-advanced portion of the Loan shall be at all times equal to or greater than the sum of the estimated cost to complete the Project less the amount required to be retained, if any, under the Construction Contract, taking into account all funding provided by the SBA Authorization; and (9) the Loan is in compliance with all EB-5 requirements.

Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require.  Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project.  Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require.  Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project.  Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

**Loan to Value.**  Unless waived by Lender in writing, the ratio of the amount of the Loan to the Value of the Property as completed shall not exceed 52.670%.

**Payments.**  At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract.  At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract.  Borrower appoints Lender as its attorney-in-fact to make such payments.  This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

**Projected Cost Overruns.**  If Lender at any time determines in its sole discretion that the amount in the Loan Fund is insufficient, or will be insufficient, to complete fully and to pay for the Project, then within ten (10) days after receipt of a written request from Lender, Borrower shall deposit in the Loan Fund an amount equal to the deficiency as determined by Lender.  The judgment and determination of Lender under this section shall be final and conclusive.  Any such amounts deposited by Borrower shall be disbursed prior to any Loan proceeds.

**Final Payment to General Contractor.**  Upon completion of the Project and fulfillment of the Construction Contract to the satisfaction of Lender and provided sufficient Loan Funds are available, Lender shall make an Advance to cover the final payment due to the General Contractor upon delivery to Lender of endorsements to the ALTA title insurance policy following the posting of the completion notice, as provided under applicable law.  Construction shall not be deemed complete for purposes of final disbursement unless and until Lender shall have received all of the following:

(1)  Evidence satisfactory to Lender that all work under the Construction Contract requiring inspection by any governmental authority with jurisdiction has been duly inspected and approved by such authority, that a certificate of occupancy has been issued, and that all parties performing work have been paid, or will be paid, for such work;

(2)  A certification by an engineer, architect, or other qualified inspector acceptable to Lender that the Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Contract, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy; and

(3)  Acceptance of the completed Improvements by Lender and Borrower.

Exhibit 1

# CONSTRUCTION LOAN AGREEMENT
## (Continued)

Notwithstanding any other provision of this Agreement to the contrary, Lender may retain up to 10.000% of the original Loan amount to be paid as the final payment to the General Contractor upon satisfaction of the conditions set forth above.

**Construction Default.** If Borrower fails in any respect to comply with the provisions of this Agreement or if construction ceases before completion regardless of the reason, Lender, at its option, may refuse to make further Advances, may accelerate the indebtedness under the terms of the Note, and without thereby impairing any of its rights, powers, or privileges, may enter into possession of the construction site and perform or cause to be performed any and all work and labor necessary to complete the improvements, substantially in accordance with the Plans and Specifications.

**Damage or Destruction.** If any of the Collateral or Improvements is damaged or destroyed by casualty of any nature, within sixty (60) days thereafter Borrower shall restore the Collateral and Improvements to the condition in which they were before such damage or destruction with funds other than those in the Loan Fund. Lender shall not be obligated to make disbursements under this Agreement until such restoration has been accomplished.

**Adequate Security.** When any event occurs that Lender determines may endanger completion of the Project or the fulfillment of any condition or covenant in this Agreement, Lender may require Borrower to furnish, within ten (10) days after delivery of a written request, adequate security to eliminate, reduce, or indemnify Lender against, such danger. In addition, upon such occurrence, Lender in its sole discretion may advance funds or agree to undertake to advance funds to any party to eliminate, reduce, or indemnify Lender against, such danger or to complete the Project. All sums paid by Lender pursuant to such agreements or undertakings shall be for Borrower's account and shall be without prejudice to Borrower's rights, if any, to receive such funds from the party to whom paid. All sums expended by Lender in the exercise of its option to complete the Project or protect Lender's interests shall be payable to Lender on demand together with interest from the date of the Advance at the rate applicable to the Loan. In addition, any Advance of funds under this Agreement, including without limitation direct disbursements to the General Contractor or other parties in payment of sums due under the Construction Contract, shall be deemed to have been expended by or on behalf of Borrower and to have been secured by Lender's Deed of Trust, if any, on the Collateral.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**LIMITATION OF RESPONSIBILITY.** The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance. No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of any contract.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Repayment.** Repay the Loan in accordance with its terms and the terms of this Agreement.

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor. In addition, Borrower shall provide Lender with written notice of the occurrence of any Event of Default, the occurrence of any Reportable Event under, or the institution of steps by Borrower to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which Borrower may have any liability.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than ninety (90) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a certified public accountant satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Additional Requirements.** Borrower shall maintain a minimum debt service coverage ratio ("DSCR") for the Project of 1.15X by 12/31/2019 and 1.35X by 12/31/20. DSCR to be tested annually based on corporate tax returns. DSCR will be calculated as follows: Net Operating Income - (minus) Reserves for Replacement/Combined Annual payments on all Project Debt (1st & 2nd Loans).

Minimum Debt Yield of 9% for the Property by 12/31/19. Debt Yield to be tested annually based on corporate tax returns. The ratio will be calculated as follows: Net Operating Income - (minus) Reserves for Replacement/Total Project Debt.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
(Continued)

**Insurance.** Maintain fire and other risk insurance, hail, federal crop insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Alpine Hospitality, Inc., a Colorado corporation | Unlimited |
| Wanda S. Bertoia, a Colorado resident | Unlimited |

**Loan Fees, Charges and Expenses.** Whether or not the Project is completed, Borrower also shall pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including, without limitation, all closing costs, fees, and disbursements, all expenses of Lender's legal counsel, and all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**Loan Proceeds.** Use the Loan Funds solely for payment of bills and expenses directly related to the Project.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender, and in all other loan agreements now or in the future existing between Borrower and any other party. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Notice of Default, Litigation and ERISA Matters.** Forthwith upon learning of the occurrence of any of the following, Borrower shall provide Lender with written notice thereof, describing the same and the steps being taken by Borrower with respect thereto: (1) the occurrence of any Event of Default, or (2) the institution of, or any adverse determination in, any litigation, arbitration proceeding or governmental proceeding, or (3) the occurrence of a Reportable Event under, or the institution of steps by Borrower to withdraw from, or the institution of any steps to terminate, any employee benefit plan as to which Borrower may have any liability.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender within thirty (30) days after the end of each fiscal quarter, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Construction of the Project.** Commence construction of the Project no later than January 15, 2016, and cause the Improvements to be constructed and equipped in a diligent and orderly manner and in strict accordance with the Plans and Specifications approved by Lender, the Construction Contract, and all applicable laws, ordinances, codes, regulations, and rights of adjoining or concurrent property owners.

Exhibit 1

**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Borrower agrees to complete the Project for purposes of final payment to the General Contractor on or before September 18, 2017, regardless of the reason for any delay.

**Defects.** Upon demand of Lender, promptly correct any defect in the Improvements or any departure from the Plans and Specifications not approved by Lender in writing before further work shall be done upon the portion of the Improvements affected.

**Project Claims and Litigation.** Promptly inform Lender of (1) all material adverse changes in the financial condition of the General Contractor; (2) any litigation and claims, actual or threatened, affecting the Project or the General Contractor, which could materially affect the successful completion of the Project or the ability of the General Contractor to complete the Project as agreed; and (3) any condition or event which constitutes a breach or default under any of the Related Documents or any contract related to the Project.

**Payment of Claims and Removal of Liens.** (1) Cause all claims for labor done and materials and services furnished in connection with the Improvements to be fully paid and discharged in a timely manner, (2) diligently file or procure the filing of a valid notice of completion of the Improvements, or such comparable document as may be permitted under applicable lien laws, (3) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Improvements for a continuous period of thirty (30) days or more, and (4) take all reasonable steps necessary to remove all claims of liens against the Collateral, the Improvements or any part of the Collateral or Improvements, or any rights or interests appurtenant to the Collateral or Improvements. Upon Lender's request, Borrower shall make such demands or claims upon or against laborers, materialmen, subcontractors, or other persons who have furnished or claim to have furnished labor, services, or materials in connection with the Improvements, which demands or claims shall under the laws of the State of Colorado require diligent assertions of lien claims upon penalty of loss or waiver thereof. Borrower shall, within ten (10) days after the filing of any claim of lien that is disputed or contested by Borrower, provide Lender with a surety bond issued by a surety acceptable to Lender sufficient to release the claim of lien or deposit with Lender an amount satisfactory to Lender for the possibility that the contest will be unsuccessful. If Borrower fails to remove any lien on the Collateral or Improvements or provide a bond or deposit pursuant to this provision, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expenses of such contest, including Lender's reasonable attorneys' fees.

**Taxes and Claims.** Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Collateral or Improvements; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (1) its legality shall be contested in good faith by appropriate proceedings, (2) the indebtedness, obligation, or claim does not become a lien or charge upon the Collateral or Improvements, and (3) Borrower shall have established on its books adequate reserves with respect to the amount contested in accordance with GAAP. If the indebtedness, obligation, or claim does become a lien or charge upon the Collateral or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests in the Collateral and Improvements.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.** Borrower shall not make any distributions other than for taxes without Lender's written consent.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Modification of Contract.** Make or permit to be made any modification of the Construction Contract.

**Liens.** Create or allow to be created any lien or charge upon the Collateral or the Improvements.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**GENERAL PROJECT PROVISIONS.** The following provisions relate to the construction and completion of the Project:

**Change Orders.** All requests for changes in the Plans and Specifications, other than minor changes involving no extra cost, must be in writing, signed by Borrower and the architect, and delivered to Lender for its approval. Borrower will not permit the performance of any work pursuant to any change order or modification of the Construction Contract or any subcontract without the written approval of Lender. Borrower will obtain any required permits or authorizations from governmental authorities having jurisdiction before approving or requesting

Exhibit 1

# CONSTRUCTION LOAN AGREEMENT
**Loan No: 1016**         (Continued)         Page 9

a new change order.

**Purchase of Materials; Conditional Sales Contracts.** No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Project shall be purchased or installed under any Security Agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider such items as personal property after their incorporation into the Project, unless otherwise authorized by Lender in writing.

**Lender's Right of Entry and Inspection.** Lender and its agents shall have at all times the right of entry and free access to the Property and the right to inspect all work done, labor performed, and materials furnished with respect to the Project. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Project.

**Lender's Right to Stop Work.** If Lender in good faith determines that any work or materials do not conform to the approved Plans and Specifications or sound building practices, or otherwise depart from any of the requirements of this Agreement, Lender may require the work to be stopped and withhold disbursements until the matter is corrected. In such event, Borrower will promptly correct the work to Lender's satisfaction. No such action by Lender will affect Borrower's obligation to complete the Improvements on or before the Completion Date. Lender is under no duty to supervise or inspect the construction or examine any books and records. Any inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement. No default of Borrower will be waived by any inspection by Lender. In no event will any inspection by Lender be a representation that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

**Indemnity.** Borrower shall indemnify, defend, and hold Lender harmless from any and all claims asserted against Lender or the Property by any person, entity, or governmental body, or arising out of or in connection with the Property, Improvements, or Project. Lender shall be entitled to appear in any proceedings to defend itself against such claims, and all costs and expenses attorneys' fees incurred by Lender in connection with such defense shall be paid by Borrower to Lender. Lender shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification. All amounts paid by Lender under this paragraph shall be secured by Lender's security agreement or Deed of Trust, if any, on the Property, shall be deemed an additional principal Advance under the Loan, payable upon demand, and shall bear interest at the rate applicable to the Loan.

**Publicity.** Lender may display a sign at the construction site informing the public that Lender is the construction lender for the Project. Lender may obtain other publicity in connection with the Project through press releases and participation in ground-breaking and opening ceremonies and similar events.

**Actions.** Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the disbursement of funds from the Loan Fund. In connection with this right, Lender may incur and pay reasonable costs, expenses and attorneys' fees. Borrower covenants to pay to Lender on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note, and Lender is authorized to disburse funds from the Loan Fund for such purposes.

**CONSTRUCTION LOAN COMMITMENT.** Lender has issued a construction loan commitment letter for the Loan to Borrower with an acceptance date of July 10, 2015 and with a closing date of December 31, 2015.

**RELATIONSHIP TO THIS AGREEMENT.** The terms and provisions of this Agreement, the Note and the Related Documents supersede any inconsistent terms and conditions of Lender's construction loan commitment letter to Borrower, provided that all obligations of Borrower under the commitment to pay any fees to Lender or any costs and expenses relating to the Loan or the commitment shall survive the execution and delivery of this Agreement, the Note and the Related Documents. Any failure of Borrower to perform any such obligation shall constitute a default under this Agreement.

**PERMANENT LOAN REQUIREMENTS.** Compliance with SBA Authorization Loan No. 80541250-05 Dated November 20, 2015 for Debenture Guaranty ("the "Debenture") issued in connection with the Project, including any amendments thereto ("SBA Authorization").

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf, or made by Guarantor, under this Agreement or the Related Documents in connection with the obtaining of the Loan evidenced by the Note or any security document directly or indirectly securing repayment of the Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.** Any execution or attachment is levied against the Collateral, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

**Change in Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Collateral such that the present or intended use of the Collateral,

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 1016                                                                                                  Page 10

as specified in the Related Documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Collateral.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Borrower and the failure by Borrower to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Breach of Construction Contract.** The Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract.

**Cessation of Construction.** Prior to the completion of construction of the Improvements and equipping of the Project, the construction of the Improvements or the equipping of the Project is abandoned or work thereon ceases for a period of more than ten (10) days for any reason, or the Improvements are not completed for purposes of final payment to the General Contractor prior to September 18, 2017, regardless of the reason for the delay.

**Transfer of Property.** Sale, transfer, hypothecation, assignment, or conveyance of the Property or the Improvements or any portion thereof or interest therein by Borrower or any Borrower without Lender's prior written consent.

**Condemnation.** All or any material portion of the Collateral is condemned, seized, or appropriated without compensation, and Borrower does not within thirty (30) days after such condemnation, seizure, or appropriation, initiate and diligently prosecute appropriate action to contest in good faith the validity of such condemnation, seizure, or appropriation.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT; REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender without notice to Borrower may have, do any one or more of the following without notice to Borrower: (a) Cancel this Agreement; (b) Institute appropriate proceedings to enforce the performance of this Agreement; (c) Withhold further disbursement of Loan Funds; (d) Expend funds necessary to remedy the default; (e) Take possession of the Property and continue construction of the Project; (f) Accelerate maturity of the Note and/or Indebtedness and demand payment of all sums due under the Note and/or Indebtedness; (g) Bring an action on the Note and/or Indebtedness; (h) Foreclose Lender's security agreement or Deed of Trust, if any, on the Property in any manner available under law; and (i) Exercise any other right or remedy which it has under the Note or Related Documents, or which is otherwise available at law or in equity or by statute.

**COMPLETION OF IMPROVEMENTS BY LENDER.** If Lender takes possession of the Collateral, it may take any and all actions necessary in its judgment to complete construction of the Improvements, including but not limited to making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any contractual arrangements, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Improvements, it will not assume any liability to Borrower or to any other person for completing the Improvements or for the manner or quality of construction of the Improvements, and Borrower expressly waives any such liability. Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Improvements, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing the construction of the Improvements will be considered to have been disbursed to Borrower and will be secured by the Collateral for the Loan. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the Note rate and being secured by the Collateral. For these purposes, Borrower assigns to Lender all of its right, title and interest in and to the Project Documents; however Lender will not have any obligation under the Project Documents unless Lender expressly hereafter agrees to assume such obligations in writing. Lender will have the right to exercise any rights of Borrower under the Project Documents upon the occurrence of an Event of Default. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently.

**ADDITIONAL DOCUMENTS.** Borrower shall provide Lender with the following additional documents:

**Articles of Organization and Company Resolutions.** Borrower has provided or will provide Lender with a certified copy of Borrower's Articles of Organization, together with a certified copy of resolutions properly adopted by the members of the company, under which the members authorized one or more designated members or employees to execute this Agreement, the Note and any and all Security Agreements directly or indirectly securing repayment of the same, and to consummate the borrowings and other transactions as contemplated under this Agreement, and to consent to the remedies following any default by Borrower as provided in this Agreement and in any Security Agreements.

**Opinion of Counsel.** When required by Lender, Borrower has provided or will provide Lender with an opinion of Borrower's counsel certifying to and that: (1) Borrower's Note, any Security Agreements and this Agreement constitute valid and binding obligations on Borrower's part that are enforceable in accordance with their respective terms; (2) Borrower is validly existing and in good standing; (3) Borrower has authority to enter into this Agreement and to consummate the transactions contemplated under this Agreement; and (4) such other matters as may have been requested by Lender or by Lender's counsel.

**AUTO DEBIT PROVISION. It is a requirement of Lender that Borrower pay Lender by ACH auto debt pursuant to the ACH payment instructions executed by Borrower in connection with this Note.**

**PROPERTY IMPROVEMENT COST RESERVE.** During Borrower's operation of the Project, Borrower may be required to perform certain property improvements including installation of upgrades, purchase of equipment or such other work that may be required by the franchisor associated with the Project (any such agreement or requirement, the "Property Improvement Plan"). Borrower shall maintain with Lender reserves for payment of Property Improvement Plan costs ("PIP Costs") which reserves shall be created by an initial deposit and either subsequent monthly payments, or payments at such other interval(s), including once per year, as Lender may require, of a sum estimated by Lender to be sufficient

Exhibit 1

to pay total annual PIP Costs commencing upon completion of the Project as follows: 1% of the annual projected revenue in years 1 and 2, 2% in year three, and 2.5% from years 4 through 10. Funds shall be released upon proof of the need for replacement of FF&E within the Property, and/or PIP requirement from the Franchisor. The reserve fund shall be held by Lender as a general deposit from Borrower. Lender shall have the right to draw upon the reserve funds to pay PIP Costs in its reasonable discretion. If the reserve funds disclose a shortage or deficiency, Borrower shall pay such shortage or deficiency as required by Lender. All amounts held in the reserve account are hereby pledged to further secure the Loan and Lender is hereby authorized to withdraw and apply such amounts on the Loan upon the occurrence of an Event of Default. Lender shall not be required to pay any interest or earning on the reserve funds.

**EB-5 JOB CREATION REQUIREMENTS.** Borrower shall comply with all requirements, including job creation and reporting requirements, set forth on the EB-5 Job Creation Addendum attached hereto as Exhibit B.

**EB-5 PROJECT ACCOUNT PROVISION.** Notwithstanding anything to the contrary contained hereon, after satisfaction of all conditions precedent listed in this Loan Agreement on the closing date of the Loan, the Loan proceeds will be deposited into a dedicated project account entitled "ALC – Best Western Premier" which project account shall constitute a segregated account from which Borrower may draw down individual advances (each, an "Advance") under the remaining balance of the Loan in accordance with the terms hereof. So long as Borrower shall comply with the requirements of the Loan Documents, Lender shall have no right to remove said Loan proceeds or otherwise refuse to fund the Loan or remove the Loan funds from the project account - which funds shall be deemed "fully committed" as of the date hereof.

**REASONABLENESS STANDARD.** Notwithstanding anything to the contrary contained herein or in any of the Related Documents, in cases throughout this agreement and the Related Documents where Lender's discretion shall be required, including but not limited to the sections entitled "Sole Discretion of Lender" and "Lender's Right of Entry and Inspection", Lender's discretion shall be exercised in accordance with a "reasonable" standard. Further, in cases where Lender may be entitled to collect attorneys' fees hereunder or in any of the other Related Documents, such attorneys' fees shall be subject to a "reasonable" standard.

**COUNTERPARTS; TELECOPIED SIGNATURES.** This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

**CO-LENDER SUPPLEMENTAL PROVISION.** Borrower acknowledges that a portion of that certain loan made to Borrower in the total amount of $10,200,000.00 (the "Loan") evidenced hereby was funded by Aileron Investment Management, LLC, having an address at 3401 W. Cypress Street, Suite 101, Tampa, Florida 33607 ("Aileron"), which interest is represented by that certain Note A dated as of the date hereof executed by Borrower in connection herewith in the amount of $5,700,000.00. Borrower acknowledges that Aileron has an undivided interest in the Loan and the rights granted to Lender herein. Borrower further acknowledges that Aileron is deemed to be a "Lender" under this agreement and the Related Documents executed in connection herewith and shall have all the rights associated therewith including the right to pursue collection of the Loan from Borrower and exercise the rights granted to Lender hereunder in its own name and to receive notices required hereunder at the above address.

Borrower's Initials _WB_ .

**DEBT SERVICE RESERVE. Debt Service Reserve.** A "Debt Service Reserve" in the amount of $500,000.00 shall be deposited with Lender from the Loan Fund on the Closing Date in the form of an unused, single purpose reserve for debt service and contingency purposes and shall be used to pay Borrower's debt service on the Loan and any other loans made by Lender to Borrower pursuant to the SBA Authorization. Interest shall accrue only on that portion of the Debt Service Reserve actually drawn down and applied in accordance with this section.

**POST CLOSING LIQUIDITY.** Borrower shall maintain post closing liquidity of at least $500,000.00 until the Property has reached a DSCR (Debt Service Coverage Ratio) of 1.15X.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Authority to File Notices.** Borrower appoints and designates Lender as its attorney-in-fact to file for the record any notice that Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Related Documents.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Borrower Information.** Borrower consents to the release of information on or about Borrower by Lender in accordance with any court order, law or regulation and in response to credit inquiries concerning Borrower.

**Counterparts.** This Agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**Indemnification of Lender.** Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorneys' fees, as well as Lender's architect's and engineering fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted Lender under this, as well as by: (1) the ownership, use, operation, construction, renovation, demolition, preservation, management, repair, condition, or maintenance of any part of the Collateral; (2) the exercise of any of Borrower's rights collaterally assigned and pledged to Lender hereunder; (3) any failure of Borrower to perform any of its obligations

Exhibit 1

hereunder; and/or (4) any failure of Borrower to comply with the environmental and ERISA obligations, representations and warranties set forth herein. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder. Borrower's indemnity obligations under this section shall not in any way be affected by the presence or absence of covering insurance, or by the amount of such insurance or by the failure or refusal of any insurance carrier to perform any obligation on its part under any insurance policy or policies affecting the Collateral and/or Borrower's business activities. Should any claim, action or proceeding be made or brought against Lender by reason of any event as to which Borrower's indemnification obligations apply, then, upon Lender's demand, Borrower, at its sole cost and expense, shall defend such claim, action or proceeding in Borrower's name, if necessary, by the attorneys for Borrower's insurance carrier (if such claim, action or proceeding is covered by insurance), or otherwise by such attorneys as Lender shall approve. Lender may also engage its own attorneys at its reasonable discretion to defend Borrower and to assist in its defense and Borrower agrees to pay the fees and disbursements of such attorneys.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Non-Liability of Lender.** The relationship between Borrower and Lender created by this Agreement is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Borrower or any contractor. Lender is not an agent or representative of Borrower. This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind Lender in any way or create any contractual duties by Lender to any contractor, subcontractor, materialman, laborer, or any other person. Borrower is exercising Borrower's own judgment with respect to Borrower's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Borrower of any matter with respect to Borrower's business. Lender and Borrower intend that Lender may reasonably rely on all information supplied by Borrower to Lender, together with all representations and warranties given by Borrower to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Notice of Lender's Breach.** Borrower must notify Lender in writing of any breach of this Agreement or the Related Documents by Lender and any other claim, cause of action or offset against Lender within thirty (30) days after the occurrence of such breach or after the accrual of such claim, cause of action or offset. Borrower waives any claim, cause of action or offset for which notice is not given in accordance with this paragraph. Lender is entitled to rely on any failure to give such notice.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Sole Discretion of Lender.** Whenever Lender's consent or approval is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of Lender and Lender's decision shall be final and conclusive.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Construction Loan Agreement, as this Construction Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Construction Loan Agreement from time to time.

**Architect's Contract.** The words "Architect's Contract" mean the architect's contract dated June 6, 2008 between Borrower and Associated Architects LTD, the architect for the Project.

**Borrower.** The word "Borrower" means WPB Hospitality, LLC, a Colorado limited liability company and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word "Collateral" includes without limitation all collateral described in the Required Collateral section of this Agreement.

**Completion Date.** The words "Completion Date" mean September 18, 2017.

**Construction Contract.** The words "Construction Contract" mean the contract dated May 5, 2015 between Borrower and Kumar Construction Management Inc., the general contractor for the Project, and any subcontracts with subcontractors, materialmen, laborers, or any other person or entity for performance of work on the Project or the delivery of materials to the Project.

**Contractor.** The word "Contractor" means Kumar Construction Management Inc., the general contractor for the Project.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan and any guarantor under a completion guaranty agreement, and, in each case, Borrower's successors, assigns, heirs, personal representatives, executors and administrators of any guarantor, surety, or accommodation party.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Collateral.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means American Lending Center, LLC, a California limited liability company, its successors and assigns.

**Loan.** The word "Loan" means the loan or loans made to Borrower under this Agreement and the Related Documents as described .

**Loan Fund.** The words "Loan Fund" mean the undisbursed proceeds of the Loan under this Agreement together with any equity funds or other deposits required from Borrower under this Agreement.

**Note.** The word "Note" means the Notes dated as of the date herein, in the original amounts of $5,700,000.00 given to Aileron Investment Management, LLC and $4,500,000.00 given to American Lending Center, LLC (Promissory Notes A and Promissory Note B, respectively) in the total amount of $10,200,000.00 and executed by Borrower together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the

Exhibit 1

## CONSTRUCTION LOAN AGREEMENT
**Loan No: 1016**                    (Continued)                         Page 14

paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Plans and Specifications.** The words "Plans and Specifications" mean the plans and specifications for the Project which have been submitted to and initialed by Lender, together with such changes and additions as may be approved by Lender in writing.

**Project.** The word "Project" means the construction project as described in the "Project Description" section of this Agreement.

**Project Documents.** The words "Project Documents" mean the Plans and Specifications, all studies, data and drawings relating to the Project, whether prepared by or for Borrower, the Construction Contract, the Architect's Contract, and all other contracts and agreements relating to the Project or the construction of the Improvements.

**Property.** The word "Property" means the property as described in the "Project Description" section of this Agreement.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in the "Project Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, individually, collectively, and interchangeably, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Value.** The word "Value" means such amount or worth as defined and determined by Lender in its sole discretion unless agreed to the contrary by Lender in writing.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS CONSTRUCTION LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS CONSTRUCTION LOAN AGREEMENT IS DATED DECEMBER 31, 2015.

BORROWER:

WPB HOSPITALITY, LLC, A COLORADO LIMITED LIABILITY COMPANY

By: _Wanda S. Bertoia_
   Wanda S. Bertoia, the Sole Member of WPB
   Hospitality, LLC, a Colorado limited liability company

LENDER:

AMERICAN LENDING CENTER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: _Stella Sheng_
   Authorized Officer

LaserPro, Ver. 15.1.10.008  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.  - CA  C:\LASERPRO\LPI\CFILPL\C41.FC  TR-53  PR-8

Exhibit 1

<u>PROMISSORY NOTE A</u>

**$5,700,000.00**

      **FOR VALUE RECEIVED**, WPB HOSPITALITY, LLC, a Colorado limited liability company having an address at 5466 S. Hannibal Court, Centennial, Colorado 80015 ("Borrower"), PROMISES TO PAY TO THE ORDER OF AILERON INVESTMENT MANAGEMENT, LLC, a Florida limited liability company having an address at 3410 W. Cypress Street, Suite 101, Tampa, Florida 33607, its successors and/or assigns ("Lender") or to its order, or at such other place or places as the holder hereof may designate from time to time, the principal sum of Five Million Seven Hundred Thousand and 00/100 Dollars ($5,700,000.00) (the "Loan") in lawful money of the United States of America or so much thereof as shall have been advanced to Borrower and remain outstanding, together with interest as set forth herein and as otherwise provided in the construction loan agreement between Lender and Borrower dated as of the date hereof (the "Loan Agreement"). The principal amount of the Loan may be drawn down by Borrower in accordance with the terms of the Loan Agreement. Capitalized terms using herein but not otherwise defined shall have the meaning set forth in the Loan Agreement.

1.    **Note Term.**

    a.    <u>Interim Period.</u>  The Loan term shall commence with a construction interim period (the "Interim Period") equal to the shorter of: (a) up to the first day of the twenty-fourth (24th) month from the date hereof (during which time the Loan proceeds may be drawn down and completion of construction of the Project must occur by the first day of the twenty-first (21st) month from the date hereof, as evidenced by a certificate of occupancy and the Debenture funded by the first day of the twenty-fourth (24th) month from the date hereof); or (b) the first day of the month following the funding of the Debenture.

    b.    <u>Extension of Interim Period.</u>  So long as no Event of Default (defined below) shall have occurred and be continuing, and otherwise in Lender's sole discretion, if the Project shall not have been timely completed and/or the Debenture funding not have occurred on or prior to the expiration of the original Interim Period term, then Borrower shall have two consecutive rights to extend the Interim Period in ninety (90) day increments each, upon payment of an extension fee to Lender equal to one half percent (0.50%) of the Loan amount per extension in order to complete the Project and reach the Debenture funding date. Any extension of the Interim Period shall result in a corresponding extension of the Interest Only Period (defined below).

    c.    <u>Term Period.</u>  So long as the Debenture has funded, or the "Interim Loan" made to Borrower in connection herewith in the amount of $4,875,000.00 has otherwise been satisfied, the Interim Period shall be followed by a ten (10) year term period (the "Term Period"). At the end of the Term Period (the "Maturity Date"), the full amount of the Loan plus any accrued interest and fees shall be due and immediately payable.

2.    **Note Repayment.**

    a.    <u>Interest Only Period.</u>  Commencing on the first day of the month following the date hereof and continuing for five (5) years, interest only shall be due and payable on the outstanding principal balance of the Loan monthly, in arrears, on the first (1st) day of each month (the "Interest Only Period").

    b.    <u>Fully Amortizing Period.</u>  Commencing on the first day of the month following the Interest Only Period and continuing until the Maturity Date, the outstanding principal balance of the Loan shall be repaid in monthly installments of principal and interest pursuant to a thirty (30) year amortization schedule. The final payment due on this Note shall be a balloon installment of such amount as may be necessary to

EXHIBIT 2

Note A – Aileron – WPB Hospitality, LLC

repay the remaining outstanding principal balance of the Loan, plus interest.

3.    **Note Interest Accrual.**

    a.    <u>Interim Period</u>: During the Interim Period, interest shall accrue and be payable on the outstanding principal balance of the Loan at a variable rate equal to the 30 Day LIBOR Rate, as quoted by Bloomberg, plus a margin of six percent (6.00%), which rate shall be adjusted monthly on the first calendar day of each month.

    b.    <u>Term Period</u>:

        i.    Commencing on the first day of the Term Period and continuing for a period of three years thereafter (the "LIBOR Fixed Rate Term"), interest shall accrue and be payable on the outstanding principal balance of the Loan at a fixed rate equal to the then current 5-year LIBOR Swap rate, as quoted by Bloomberg, plus a margin of five percent (5.00%) per annum with a floor rate of six percent (6.00%).

        ii.    Following the LIBOR Fixed Rate Term, and continuing for the remainder of the Term Period, interest shall accrue and be payable on the outstanding principal balance of the Loan at a rate equal to the then current 90-day LIBOR rate, as quoted by Bloomberg, adjusted on the first day of each calendar quarter, plus a margin of five percent (5.00%) per annum, with a LIBOR floor rate of one percent (1.00%).

    c.    <u>Interest Accrual.</u>  Interest shall accrue on the outstanding principal balance of this Note from day to day for the actual number of days elapsed, calculated on the basis of a 360 day year.

4.    **Note Prepayment.**  Subject to the terms of the Loan Agreement, during the Interest Only Period, the outstanding principal balance of this Note may not be prepaid in whole or in part for any reason. Thereafter, the outstanding principal balance of this Note may be prepaid in whole or part at any time without penalty upon not less than ten (10) days' written notice to Lender.

5.    **Construction Loan Agreement and Enforcement.**  This obligation of this Note shall become due and payable in its entirety in accordance with the provisions contained in the Loan Agreement.  The borrowing evidenced by this Note is made pursuant to the Loan Agreement and is secured by the Loan Documents.  This Note may be cancelled, terminated or otherwise modified pursuant to the terms of the Loan Agreement.  In the event it shall become necessary for the holder hereof to employ counsel to effect collection of this Note, the Borrower agrees to pay to the holder hereof reasonable attorneys' fees and disbursements in addition to all other costs, allowances and additional allowances as provided by law. The parties hereto specifically agree and acknowledge that the liens created by the Deed of Trust (as defined in the Loan Agreement) survive, and do not merge with, any judgment of foreclosure subsequently obtained after default, and Borrower hereby expressly agrees that in the event of a judgment of foreclosure being obtained, a holder of this Note shall be entitled to reasonable attorneys' fees both prior to and subsequent to the entry of a judgment of foreclosure and through the satisfaction of said judgment of foreclosure.  In the event the Borrower fails to perform any term, obligation, covenant, or agreement to be fulfilled hereunder or under the Loan Agreement or any of the Related Documents, such failure shall constitute an "Event of Default" hereunder subject to any cure periods contained in the Loan Agreement.  Upon the occurrence of an Event of Default, the holder of this Note shall be entitled to accelerate the payment of this Note as if the same had matured and to exercise and enforce any and all rights and remedies provided for hereunder or in any of the Loan Documents, at law or in equity.  In the event the holder shall elect to

EXHIBIT 2

Note A – Aileron – WPB Hospitality, LLC

accelerate the Maturity Date by reason of an event of default, then the entire principal balance and all interest accrued thereon, together with any other charges and fees required to be paid hereunder, shall become immediately due and payable in full.

6.    **Default Interest.** Upon the occurrence of an Event of Default, it is expressly understood and agreed that, in addition to any other charges assessed pursuant to the Loan Agreement, this Note shall bear interest at a rate equal to the then applicable rate as calculated pursuant to this Note, as adjusted from time to time, plus five (5%) percent (the "Default Rate") to be due and payable on the 1st day of each month after maturity until the full principal indebtedness shall be paid to the holder of this Note. Interest at the Default Rate shall accrue through and including the date upon which a judgment of foreclosure/sale is fully satisfied and the Default Rate shall be included in any judgment to enforce this Note.

7.    **Miscellaneous Provisions.**

    a.    *Presentment.* Presentment for payment, notice of dishonor and protest for nonpayment are expressly waived. All payments due hereunder shall be made payable directly to the holder of this Note without the requirement of endorsement. This Note may not be changed or terminated orally.

    b.    *Severability.* In the event any of the terms or conditions of this Note shall be in conflict or in violation of any laws of the jurisdiction of enforcement, the holder hereof shall have the right to make any commercially reasonable adjustment as may be necessary to effectuate compliance therewith without in any way affecting the security of the liens granted under the Loan Documents or the obligations secured thereby.

    c.    *WAIVER OF TRIAL BY JURY.* Borrower expressly waives trial by jury in any litigation involving or concerning this Note. The Borrower expressly permits the holder of this Note to concurrently or successively enforce this Note against the security granted by the Loan Documents in addition to seeking to enforce this Note.

    d.    *A-B Note.* The indebtedness represented by this Note represents a portion of the total of that certain loan made to Borrower in the entire amount of $10,200,000.00 (the "Total Loan") for construction of the Project as further described in the Loan Agreement and is secured by the Related Documents. The remaining $4,500,000.00 of the Total Loan is represented by that certain "B Note" given by Borrower to American Lending Center, LLC, a California limited liability company ("ALC"). Borrower further acknowledges that Lender is hereby deemed to be a "Lender" under the Related Documents and shall have all the rights associated therewith including the right to pursue collection of any sums due hereunder or under the Related Documents from Borrower in its own name and to receive notices required under the Related Documents. The indebtedness of the B Note is subordinated to this Note pursuant to the terms of an intercreditor agreement executed by ALC and Lender.

-SPACE LEFT BLANK-

EXHIBIT 2

Note A – Aileron – WPB Hospitality, LLC

Dated: December 31, 2015

**BORROWER:**

WPB HOSPITALITY, LLC

By: _Wanda S. Bertoia_
Name:  Wanda S. Bertoia
Title:  Sole Member

EXHIBIT 2

## ALLONGE TO PROMISSORY NOTE A

This Allonge to Promissory Note dated April 20, 2018 is to be attached to that certain promissory note "A" (the "Note") dated December 31, 2015 made by **WPB HOSPITALITY, LLC,** a Colorado limited liability company, to **AILERON INVESTMENT MANAGEMENT, LLC,** a Florida limited liability company as lender/holder, in the original principal amount of $5,700,000.00.

Pay the obligations of the Note now to the order of **AMERICAN LENDING CENTER, LLC,** a California limited liability company.

<div style="text-align:right">

**AILERON INVESTMENT MANAGEMENT, LLC**

By: _____

Name: JOSEPH BONORA

Title: MANAGING DIRECTOR

</div>

EXHIBIT 2

# PROMISSORY NOTE B

**$4,500,000.00**

      **FOR VALUE RECEIVED**, WPB HOSPITALITY, LLC, a Colorado limited liability company having an address at 5466 S. Hannibal Court, Centennial, Colorado 80015 ("Borrower"), PROMISES TO PAY TO THE ORDER OF AMERICAN LENDING CENTER, LLC, a California limited liability company having an address at 1 World Trade Center, Suite 1180, Long Beach, California 90831 ("Lender" − on behalf of those limited partnerships described in the accompanying "Letter of Understanding") or to its order, or at such other place or places as the holder hereof may designate from time to time, the principal sum of Four Million Five Hundred Thousand and 00/100 Dollars ($4,500,000.00) (the "Loan") in lawful money of the United States of America or so much thereof as shall have been advanced to Borrower and remain outstanding, together with interest as set forth herein and as otherwise provided in the construction loan agreement between Lender and Borrower dated as of the date hereof (the "Loan Agreement"). The principal amount of the Loan shall be drawn down by Lender in accordance with the terms of the Loan Agreement. Capitalized terms using herein but not otherwise defined shall have the meaning set forth in the Loan Agreement.

1.    **Note Term.**

      a.    <u>Interim Period.</u> The Loan term shall commence with a construction interim period (the "Interim Period") equal to the shorter of: (a) up to the first day of the twenty-fourth (24th) month from the date hereof (during which time the Loan proceeds may be drawn down and completion of construction of the Project must occur by the first day of the twenty-first (21st) month from the date hereof, as evidenced by a certificate of occupancy and the Debenture funded by the first day of the twenty-fourth (24th) month from the date hereof); or (b) the first day of the month following the funding of the Debenture.

      b.    <u>Extension of Interim Period.</u> So long as no Event of Default (defined below) shall have occurred and be continuing, and otherwise in Lender's sole discretion, if the Project shall not have been timely completed and/or the Debenture funding not have occurred on or prior to the expiration of the original Interim Period term, then Borrower shall have two consecutive rights to extend the Interim Period in ninety (90) day increments each, upon payment of an extension fee to Lender equal to one half percent (0.50%) of the Loan amount per extension in order to complete the Project and reach the Debenture funding date. Any extension of the Interim Period shall result in a corresponding extension of the Interest Only Period (defined below).

      c.    <u>Term Period.</u> So long as the Debenture has funded, or the "Interim Loan" made to Borrower in connection herewith in the amount of $4,875,000.00 has otherwise been satisfied, the Interim Period shall be followed by a ten (10) year term period (the "Term Period"). At the end of the Term Period (the "Maturity Date"), the full amount of the Loan plus any accrued interest and fees shall be due and immediately payable.

2.    **Note Repayment.**

      a.    <u>Interest Only Period.</u> Commencing on the first day of the month following the date hereof and continuing for five (5) years, interest only shall be due and payable on the outstanding principal balance of the Loan monthly, in arrears, on the first (1st) day of each month (the "Interest Only Period").

      b.    <u>Fully Amortizing Period.</u> Commencing on the first day of the month following the Interest Only Period and continuing until the Maturity Date, the outstanding principal balance of the Loan shall be repaid in monthly installments of principal and interest pursuant to a thirty (30) year amortization schedule.

EXHIBIT 3

Note B – ALC – WPB Hospitality, LLC

The final payment due on this Note shall be a balloon installment of such amount as may be necessary to repay the remaining outstanding principal balance of the Loan, plus interest.

3.    **Note Interest Accrual.**

    a.    <u>Interim Period</u>: During the Interim Period, interest shall accrue and be payable on the outstanding principal balance of the Loan at a variable rate equal to the 30 Day LIBOR Rate, as quoted by Bloomberg, plus a margin of six percent (6.00%), which rate shall be adjusted monthly on the first calendar day of each month.

    b.    <u>Term Period</u>:

        i.    Commencing on the first day of the Term Period and continuing for a period of three years thereafter (the "LIBOR Fixed Rate Term"), interest shall accrue and be payable on the outstanding principal balance of the Loan at a fixed rate equal to the then current 5-year LIBOR Swap rate, as quoted by Bloomberg, plus a margin of five percent (5.00%) per annum with a floor rate of six percent (6.00%).

        ii.    Following the LIBOR Fixed Rate Term, and continuing for the remainder of the Term Period, interest shall accrue and be payable on the outstanding principal balance of the Loan at a rate equal to the then current 90-day LIBOR rate, as quoted by Bloomberg, adjusted on the first day of each calendar quarter, plus a margin of five percent (5.00%) per annum, with a LIBOR floor rate of one percent (1.00%).

    c.    <u>Interest Accrual.</u>  Interest shall accrue on the outstanding principal balance of this Note from day to day for the actual number of days elapsed, calculated on the basis of a 360 day year.

4.    **Note Prepayment.**  Subject to the terms of the Loan Agreement, during the Interest Only Period, the outstanding principal balance of this Note may not be prepaid in whole or in part for any reason. Thereafter, the outstanding principal balance of this Note may be prepaid in whole or part at any time without penalty upon not less than ten (10) days' written notice to Lender.

5.    **Construction Loan Agreement and Enforcement.**  This obligation of this Note shall become due and payable in its entirety in accordance with the provisions contained in the Loan Agreement.  The borrowing evidenced by this Note is made pursuant to the Loan Agreement and is secured by the Loan Documents.  This Note may be cancelled, terminated or otherwise modified pursuant to the terms of the Loan Agreement.  In the event it shall become necessary for the holder hereof to employ counsel to effect collection of this Note, the Borrower agrees to pay to the holder hereof reasonable attorneys' fees and disbursements in addition to all other costs, allowances and additional allowances as provided by law. The parties hereto specifically agree and acknowledge that the liens created by the Deed of Trust (as defined in the Loan Agreement) survive, and do not merge with, any judgment of foreclosure subsequently obtained after default, and Borrower hereby expressly agrees that in the event of a judgment of foreclosure being obtained, a holder of this Note shall be entitled to reasonable attorneys' fees both prior to and subsequent to the entry of a judgment of foreclosure and through the satisfaction of said judgment of foreclosure.  In the event the Borrower fails to perform any term, obligation, covenant, or agreement to be fulfilled hereunder or under the Loan Agreement or any of the Related Documents, such failure shall constitute an "Event of Default" hereunder subject to any cure periods contained in the Loan Agreement.  Upon the occurrence of an Event of Default, the holder of this Note shall be entitled to accelerate the payment of this Note as if the same had matured and to exercise and enforce any and all rights and remedies provided for

EXHIBIT 3

Note B – ALC – WPB Hospitality, LLC

hereunder or in any of the Loan Documents, at law or in equity.  In the event the holder shall elect to accelerate the Maturity Date by reason of an event of default, then the entire principal balance and all interest accrued thereon, together with any other charges and fees required to be paid hereunder, shall become immediately due and payable in full.

6.      **Default Interest.** Upon the occurrence of an Event of Default, it is expressly understood and agreed that, in addition to any other charges assessed pursuant to the Loan Agreement, this Note shall bear interest at a rate equal to the then applicable rate as calculated pursuant to this Note, as adjusted from time to time, plus five (5%) percent (the "Default Rate") to be due and payable on the 1st day of each month after maturity until the full principal indebtedness shall be paid to the holder of this Note.  Interest at the Default Rate shall accrue through and including the date upon which a judgment of foreclosure/sale is fully satisfied and the Default Rate shall be included in any judgment to enforce this Note.

7.      **Miscellaneous Provisions.**

        a.      *Presentment.* Presentment for payment, notice of dishonor and protest for nonpayment are expressly waived.  All payments due hereunder shall be made payable directly to the holder of this Note without the requirement of endorsement.  This Note may not be changed or terminated orally.

        b.      *Severability.*  In the event any of the terms or conditions of this Note shall be in conflict or in violation of any laws of the jurisdiction of enforcement, the holder hereof shall have the right to make any commercially reasonable adjustment as may be necessary to effectuate compliance therewith without in any way affecting the security of the liens granted under the Loan Documents or the obligations secured thereby.

        c.      *WAIVER OF TRIAL BY JURY.*  Borrower expressly waives trial by jury in any litigation involving or concerning this Note.  The Borrower expressly permits the holder of this Note to concurrently or successively enforce this Note against the security granted by the Loan Documents in addition to seeking to enforce this Note.

        d.      *A-B Note.*  The indebtedness represented by this Note represents a portion of the total of that certain loan made to Borrower in the entire amount of $10,200,000.00 (the "Total Loan") for construction of the Project as further described in the Loan Agreement and is secured by the Related Documents.  The remaining $5,700,000.00 of the Total Loan is represented by that certain "A Note" given by Borrower to Aileron Investment Management, LLC, a Florida limited liability company ("Aileron").  The indebtedness of this B Note is subordinated to the A Note pursuant to the terms of an intercreditor agreement executed by Aileron and Lender.

-SPACE LEFT BLANK-

EXHIBIT 3

Note B -- ALC -- WPB

Dated: December 31, 2015

**BORROWER:**

WPB HOSPITALITY, LLC

By: _Wanda S. Bertoia_

Name:  Wanda S. Bertoia
Title:  Sole Member

EXHIBIT 3

2016002425
Page: 1 of 12

01/08/2016 08:26 AM          R $66.00          D $0.00
City & County of Denver                         DOT
Electronically Recorded

**RECORDATION REQUESTED BY:**
American Lending Center, LLC, a California
limited liability company
1 World Trade Center
Suite 1180
Long Beach, CA  90831

**WHEN RECORDED MAIL TO:**
BLACKHALL, P.C.
Justin Blackhall, Esq.
321 Millburn Avenue, Suite 6
Millburn, NJ  07041

**SEND TAX NOTICES TO:**
American Lending Center, LLC, a California
limited liability company
1 World Trade Center
Suite 1180
Long Beach, CA  90831



_____
**FOR RECORDER'S USE ONLY**

## CONSTRUCTION DEED OF TRUST

**MAXIMUM PRINCIPAL AMOUNT SECURED.** The Lien of this Deed of Trust shall not exceed at any one time $10,200,000.00 except as allowed under applicable Colorado law.

**THIS DEED OF TRUST is dated December 31, 2015, among WPB Hospitality, LLC, a Colorado limited liability company, whose address is 5466 S. Hannibal Court, Centennial, CO  80015 ("Grantor"); American Lending Center, LLC, a California limited liability company, whose address is 1 World Trade Center, Suite 1180, Long Beach, CA  90831 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and the Public Trustee of the City and County of Denver, Colorado (referred to below as "Trustee").**

**CONVEYANCE AND GRANT.  For valuable consideration**, Grantor hereby irrevocably grants, transfers and assigns to Trustee for the benefit of Lender as Beneficiary all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Denver County, State of Colorado:

A parcel of land being a portion of Plot 1, Block 1, Gateway Park IV - Denver Filing No. 2, Being more particularly described as follows:

COMMENCING at the northwest corner of said Plot 1;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 295.63 feet to the true point of beginning;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 396.64 feet to the northeast corner of said Plot 1;
THENCE the following three (3) course along the East line of said Plot 1:
1. THENCE South 10 degrees 26 minutes 16 seconds West, a distance of 95.89 feet to a point of curve;
2. THENCE along the arc of a curve to the left, having a central angle of 10 degrees 34 minutes 10 seconds, a radius of 315.00 feet and an arc length of 58.11 feet;
3. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 307.25 feet to the southeast corner of said Plot 1;
THENCE the following four (4) courses along the South line of said Plot 1:
1. THENCE South 89 degrees 52 minutes 06 seconds West, a distance of 100.00 feet;
2. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 5.00 feet to a point on the North right-of-way line of 40th Avenue, as dedicated by 40th Avenue, Chambers Road - Pena Boulevard Subdivision, recorded May 6, 1997, at Reception Number 9700057406, said City and County of Denver Records;

EXHIBIT 4

**DEED OF TRUST**
**(Continued)**

Loan No: 1016                                                                                                      Page 2

3. THENCE South 89 degrees 52 minutes 06 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 250.09 feet;

4. THENCE South 89 degrees 52 minutes 04 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 23.63 feet;

THENCE North 00 degrees 07 minutes 54 seconds West, a distance of 464.23 feet to the true point of beginning, City and County of Denver, State of Colorado.

**The Real Property or its address is commonly known as  16161 E. 40th Avenue, Denver, CO  80239.**

**FUTURE ADVANCES.** In addition to the Note, this Deed of Trust secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. This Deed of Trust secures, in addition to the amounts specified in the Note, future advances in an unlimited amount, together with all interest thereon, which future advances Lender is obligated to make so long as Grantor complies with all the terms and conditions of the Note or other loan agreement.

Grantor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS ALSO GIVEN TO SECURE ANY AND ALL OF GRANTOR'S OBLIGATIONS UNDER THAT CERTAIN CONSTRUCTION LOAN AGREEMENT BETWEEN GRANTOR AND LENDER OF EVEN DATE HEREWITH.  ANY EVENT OF DEFAULT UNDER THE CONSTRUCTION LOAN AGREEMENT, OR ANY OF THE RELATED DOCUMENTS REFERRED TO THEREIN, SHALL ALSO BE AN EVENT OF DEFAULT UNDER THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.**  Except as otherwise provided in this Deed of Trust, Grantor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Grantor's obligations under the Note, this Deed of Trust, and the Related Documents.

**CONSTRUCTION MORTGAGE.**  This Deed of Trust is a "construction mortgage" for the purposes of Sections 9-334 and 2A-309 of the Uniform Commercial Code, as those sections have been adopted by the State of Colorado.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.**  Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.**  Until the occurrence of an Event of Default, Grantor may  (1)  remain in possession and control of the Property;  (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

**Duty to Maintain.**  Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.**  Grantor represents and warrants to Lender that:  (1)  During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (a)  any breach or violation of any Environmental Laws,  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)  Except as previously disclosed to and acknowledged by Lender in writing,  (a)  neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and  (b)  any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws.  Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust.  Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person.  The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances.  Grantor hereby  (1)  releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor.  The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

EXHIBIT 4

**DEED OF TRUST**
**(Continued)**

Loan No: 1016                                                                                   Page 3

Without otherwise limiting Grantor's covenants as provided herein, Grantor shall not without Lender's prior written consent, remove or permit the removal of sand, gravel or topsoil, or engage in borrow pit operations, or use or permit the use of the Property as a land fill or dump, or store, burn or bury or permit the storage, burning or burying of any material or product which may result in contamination of the Property or the groundwater or which may require the issuance of a permit by the Environmental Protection Agency or any state or local government agency governing the issuance of hazardous or toxic waste permits, or request or permit a change in zoning or land use classification, or cut or remove or suffer the cutting or removal of any trees or timber from the Property.

At its sole cost and expense, Grantor shall comply with and shall cause all occupants of the Property to comply with all Environmental Laws with respect to the disposal of industrial refuse or waste, and/or the discharge, processing, manufacture, generation, treatment, removal, transportation, storage and handling of Hazardous Substances, and pay immediately when due the cost of removal of any such wastes or substances from, and keep the Property free of any lien imposed pursuant to such laws, rules, regulations and orders.

Grantor shall not install or permit to be installed in or on the Property, friable asbestos or any substance containing asbestos and deemed hazardous by federal, state or local laws, rules, regulations or orders respecting such material. Grantor shall further not install or permit the installation of any machinery, equipment or fixtures containing polychlorinated biphenyls (PCBs) on or in the Property. With respect to any such material or materials currently present in or on the Property, Grantor shall promptly comply with all applicable Environmental Laws regarding the safe removal thereof, at Grantor's expense.

Grantor shall indemnify and defend Lender and hold Lender harmless from and against all loss, cost, damage and expense (including, without limitation, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that Lender may incur as a result of or in connection with the assertion against Lender of any claim relating to the presence or removal of any Hazardous Substance, or compliance with any Environmental Law. No notice from any governmental body has ever been served upon Grantor or, to Grantor's knowledge after due inquiry, upon any prior owner of the Property, claiming a violation of or under any Environmental Law or concerning the environmental state, condition or quality of the Property, or the use thereof, or requiring or calling attention to the need for any work, repairs, construction, removal, cleanup, alterations, demolition, renovation or installation on, or in connection with, the Property in order to comply with any Environmental Law; and upon receipt of any such notice, Grantor shall take any and all steps, and shall perform any and all actions necessary or appropriate to comply with the same, at Grantor's expense. In the event Grantor fails to do so, Lender may declare this Deed of Trust to be in default.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**Construction Loan.** If some or all of the proceeds of the loan creating the Indebtedness are to be used to construct or complete construction of any Improvements on the Property, the Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Grantor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Deed of Trust shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale,

EXHIBIT 4

# DEED OF TRUST
## (Continued)

**Loan No: 1016**                                                                                        **Page 4**

assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Colorado law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. All policies shall provide that the policies shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Deed of Trust at any trustee's sale or other sale held under the provisions of this Deed of Trust, or at any foreclosure sale of such Property.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a

EXHIBIT 4

# DEED OF TRUST
## (Continued)

Loan No: 1016                                                                                           Page 5

report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**TAX AND INSURANCE RESERVES.** Subject to any limitations and consistent with any requirements set by applicable law, Lender may require Grantor to maintain with Lender reserves for payment of annual taxes, assessments, and insurance premiums, which reserves shall be created by an initial deposit and subsequent monthly payments, or payments at such other interval as payments under the Note may be due, of a sum estimated by Lender to be sufficient to pay the total annual taxes, assessments, and insurance premiums Lender reasonably anticipates to be paid from these reserves. The reserve funds shall be held by Lender as a general deposit from Grantor, which Lender may satisfy by payment of the taxes, assessments, and insurance premiums required to be paid by Grantor as they become due. Lender shall have the right to draw upon the reserve funds to pay such items, and Lender shall not be required to determine the validity or accuracy of any item before paying it. Nothing in the Deed of Trust shall be construed as requiring Lender to advance other monies for such purposes, and Lender shall not incur any liability for anything it may do or omit to do with respect to the reserve account. Subject to any limitations set by applicable law, if the reserve funds disclose a shortage or deficiency, Grantor shall pay such shortage or deficiency as required by Lender. All amounts in the reserve account are hereby pledged to further secure the Indebtedness, and Lender is hereby authorized to withdraw and apply such amounts on the Indebtedness upon the occurrence of an Event of Default. Lender shall not be required to pay any interest or earnings on the reserve funds unless required by law or agreed to by Lender in writing. Lender does not hold the reserve funds in trust for Grantor, and Lender is not Grantor's agent for payment of the taxes and assessments required to be paid by Grantor.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Deed of Trust:

**Notice of Proceedings.** Grantor shall immediately notify Lender in writing should all or any part of the Property become subject to any condemnation or expropriation proceedings or other similar proceedings, including without limitation, any condemnation, confiscation, eminent domain, inverse condemnation or temporary requisition or taking of the mortgaged Property, or any part or parts of the Property. Grantor further agrees to promptly take such steps as may be necessary and proper within Lender's sole judgment and at Grantor's expense, to defend any such condemnation or expropriation proceedings and obtain the proceeds derived from such proceedings. Grantor shall not agree to any settlement or compromise or any condemnation or expropriation claim without Lender's prior written consent.

**Lender's Participation.** Lender may, at Lender's sole option, elect to participate in any such condemnation or expropriation proceedings and be represented by counsel of Lender's choice. Grantor agrees to provide Lender with such documentation as Lender may request to permit Lender to so participate and to reimburse Lender for Lender's costs associated with Lender's participation, including Lender's reasonable attorneys' fees.

EXHIBIT 4

# DEED OF TRUST
## (Continued)

**Conduct of Proceedings.** If Grantor fails to defend any such condemnation or expropriation proceedings to Lender's satisfaction, Lender may undertake the defense of such a proceeding for and on behalf of Grantor. To this end, Grantor irrevocably appoints Lender as Grantor's agent and attorney-in-fact, such agency being coupled with an interest, to bring, defend, adjudicate, settle, or otherwise compromise such condemnation or expropriation claims; it being understood, however, that, unless one or more Events of Default (other than the condemnation or expropriation of the Property) then exists under this Deed of Trust, Lender will not agree to any final settlement or compromise of any such condemnation or expropriation claim without Grantor's prior approval, which approval shall not be unreasonably withheld.

**Application of Net Proceeds.** Lender shall have the right to receive all proceeds derived or to be derived from the condemnation, expropriation, confiscation, eminent domain, inverse condemnation, or any permanent or temporary requisition or taking of the Property, or any part or parts of the Property ("condemnation proceeds"). In the event that Grantor should receive any such condemnation proceeds, Grantor agrees to immediately turn over and to pay such proceeds to Lender. All condemnation proceeds, which are received by, or which are payable to either Grantor or Lender, shall be applied, at Lender's sole option and discretion, and in such manner as Lender may determine (after payment of all reasonable costs, expenses and attorneys' fees necessarily paid or incurred by Grantor and/or Lender), for the purpose of: (a) replacing or restoring the condemned, expropriated, confiscated, or taken Property; or (b) reducing the then outstanding balance of the Indebtedness, together with interest thereon, with such payments being applied in the manner provided in this Deed of Trust. Lender's receipt of such condemnation proceeds and the application of such proceeds as provided in this Deed of Trust shall not affect the lien of this Deed of Trust.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first

EXHIBIT 4

**DEED OF TRUST**

Loan No: 1016

**(Continued)**

Page 7

and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** Upon the full performance of all the obligations under the Note and this Deed of Trust, Trustee may, upon production of documents and fees as required under applicable law, release this Deed of Trust, and such release shall constitute a release of the lien for all such additional sums and expenditures made pursuant to this Deed of Trust. Lender agrees to cooperate with Grantor in obtaining such release and releasing the other collateral securing the Indebtedness. Any release fees required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf, or made by Guarantor, or any other guarantor, endorser, surety, or accommodation party, under this Deed of Trust or the Related Documents in connection with the obtaining of the Indebtedness evidenced by the Note or any security document directly or indirectly securing repayment of the Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.** Any execution or attachment is levied against the Property, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

**Change in Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Property such that the present or intended use of the Property, as specified in the Related Documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Property.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Grantor and the failure by Grantor to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or

EXHIBIT 4

**DEED OF TRUST**

Loan No: 1016                          **(Continued)**                          Page 8

other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor, or any other guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any Guarantor, or any other guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment fee which Grantor would be required to pay.

**Foreclosure.** Lender shall have the right to cause all or any part of the Real Property, and Personal Property, if Lender decides to proceed against it as if it were real property, to be sold by the Trustee according to the laws of the State of Colorado as respects foreclosures against real property. The Trustee shall give notice in accordance with the laws of Colorado. The Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including but not limited to Trustee's fees, attorneys' fees, and the cost of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled to the excess.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon ex parte application and without notice, notice being expressly waived.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Sale of the Property.** In exercising its rights and remedies, Lender shall be free to designate on or before it files a notice of election and demand with the Trustee, that the Trustee sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property. Upon any sale of the Property, whether made under a power of sale granted in this Deed of Trust or pursuant to judicial proceedings, if the holder of the Note is a purchaser at such sale, it shall be entitled to use and apply all, or any portion of, the Indebtedness for or in settlement or payment of all, or any portion of, the purchase price of the Property purchased, and, in such case, this Deed of Trust, the Note, and any documents evidencing expenditures secured by this Deed of Trust shall be presented to the person conducting the sale in order that the amount of Indebtedness so used or applied may be credited thereon as having been paid.

EXHIBIT 4

**DEED OF TRUST**
**(Continued)**

**Attorneys' Fees; Expenses.** If Lender forecloses or institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** To the extent permitted by applicable law, Trustee shall have all of the rights and duties of Lender as set forth in this section.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**CO-LENDER SUPPLEMENTAL PROVISION.** Grantor acknowledges that a portion of that certain loan made to Grantor in the total amount of $10,200,000.00 (the "Loan") secured hereby was funded by Aileron Investment Management, LLC, having an address at 3401 W. Cypress Street, Suite 101, Tampa, Florida 33607 ("Aileron"), which interest is represented by a certain Note A dated as of the date hereof executed by Grantor in connection herewith in the amount of $5,700,000.00. Grantor acknowledges that Aileron has an undivided interest in the Loan and the rights granted to Lender herein. Grantor further acknowledges that Aileron is deemed to be a "Lender" under this agreement and the Related Documents executed in connection herewith and shall have all the rights associated therewith including the right to pursue collection of the Loan from Grantor and exercise the rights granted to Lender hereunder in its own name and to receive notices required hereunder at the above address.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Property, this Deed of Trust will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of Colorado. In all other respects, this Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Deed of Trust is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Deed of Trust has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's

EXHIBIT 4

**DEED OF TRUST**
**(Continued)**

Loan No: 1016                                                                 Page 10

---

rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Non-Liability of Lender.** The relationship between Grantor and Lender created by this Deed of Trust is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Grantor. Grantor is exercising Grantor's own judgment with respect to Grantor's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Grantor of any matter with respect to Grantor's business. Lender and Grantor intend that Lender may reasonably rely on all information supplied by Grantor to Lender, together with all representations and warranties given by Grantor to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**Sole Discretion of Lender.** Whenever Lender's consent or approval is required under this Deed of Trust, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of Lender and Lender's decision shall be final and conclusive.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Deed of Trust hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Colorado as to all Indebtedness secured by this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means American Lending Center, LLC, a California limited liability company, and its successors and assigns.

**Borrower.** The word "Borrower" means WPB Hospitality, LLC, a Colorado limited liability company and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Grantor.** The word "Grantor" means WPB Hospitality, LLC, a Colorado limited liability company.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness, and, in each case, the successors, assigns, heirs, personal representatives, executors and administrators of any guarantor, surety, or accommodation party.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor, or any other guarantor, endorser, surety, or

EXHIBIT 4

## DEED OF TRUST
### (Continued)

Loan No: 1016                                                                                                    Page 11

accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Deed of Trust, together with all interest thereon.

**Lender.** The word "Lender" means American Lending Center, LLC, a California limited liability company, its successors and assigns.

**Note.** The word "Note" means the Notes dated as of the date herein, in the original amounts of $5,700,000.00 given to Aileron Investment Management, LLC and $4,500,000.00 given to American Lending Center, LLC (Promissory Notes A and Promissory Note B, respectively) in the total amount of $10,200,000.00 and executed by Borrower together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or credit agreement. The maturity date of the Note is January 1, 2028. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Trustee.** The word "Trustee" means the Public Trustee of the City and County of Denver, Colorado.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

WPB HOSPITALITY, LLC, A COLORADO LIMITED LIABILITY COMPANY

By: _Wanda S. Bertola_____
Wanda S. Bertola, the Sole Member of WPB Hospitality, LLC, a Colorado limited liability company

EXHIBIT 4

**DEED OF TRUST**

Loan No: 1016                                  **(Continued)**                                    **Page 12**

===

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF _Colorado_ _____ )
                                                                    ) SS
COUNTY OF _Arapahoe_ _____ )

On this _30th_ _____ day of _December_ _____, 20 _15_ , before me, the undersigned Notary Public, personally appeared Wanda S. Bertola, the Sole Member of WPB Hospitality, LLC, a Colorado limited liability company, _____ of WPB Hospitality, LLC, a Colorado limited liability company, and known to me to be a member or designated agent of the limited liability company that executed the Deed of Trust and acknowledged the Deed of Trust to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Deed of Trust and in fact executed the Deed of Trust on behalf of the limited liability company.

By _Jffry R Bergstrom_ _____    Residing at _____

Notary Public in and for the State of _____ My commission expires _____

```
┌────────────────────────────────────────┐
│       JEFFREY R BERGSTROM               │
│         NOTARY PUBLIC                   │
│       STATE OF COLORADO                 │
│   NOTARY ID # 19954005172              │
│  MY COMMISSION EXPIRES JUNE 28, 2019    │
└────────────────────────────────────────┘
```

LaserPro,  Ver.  15.1.10.038   Copr.  D+H  USA  Corporation  1997,  2015.    All  Rights  Reserved.    -  CO/CA
C:\LASERPRO\LP\CFI\LPL\G01.FC  TR-53  PR-8

EXHIBIT 4

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $10,200,000.00 | 12-31-2015 | 01-01-2028 | 1016 | | | 155 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** WPB Hospitality, LLC, a Colorado limited liability company
5466 S. Hannibal Court
Centennial, CO  80015

**Lender:** American Lending Center, LLC, a California limited liability company
1 World Trade Center
Suite 1180
Long Beach, CA  90831

**THIS COMMERCIAL SECURITY AGREEMENT** dated December 31, 2015, is made and executed between WPB Hospitality, LLC, a Colorado limited liability company ("Grantor") and American Lending Center, LLC, a California limited liability company ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

(1): All Furniture, Fixtures and Equipment (as each term is defined in the UCC); whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing located on, used in connection with or otherwise associated with, the real property described herein which is commonly known as 16161 E. 40th Avenue, Denver, CO; (2); certain cash proceeds in the original amount of $215,554.75 held in a pledged account with Northeast Bank and any interest derived therefrom as further described in an account pledge agreement executed in connection herewith (the "Cash Proceeds").

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Some or all of the Collateral may be located on the following described real estate:

A parcel of land being a portion of Plot 1, Block 1, Gateway Park IV - Denver Filing No. 7, being more particularly described as follows:
COMMENCING at the northwest corner of said Plot 1;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 295.63 feet to the true point of beginning;
THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 396.64 feet to the northeast corner of said Plot 1;
THENCE the following three (3) course along the East line of said Plot 1:
1. THENCE South 10 degrees 26 minutes 16 seconds West, a distance of 95.82 feet to a point of curve;
2. THENCE along the arc of a curve to the left, having a central angle of 10 degrees 34 minutes 10 seconds, a radius of 315.00 feet and an arc length of 58.11 feet;
3. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 307.25 feet to the southeast corner of said Plot 1;
THENCE the following four (4) courses along the South line of said Plot 1:
1. THENCE South 89 degrees 52 minutes 06 seconds West, a distance of 100.00 feet;
2. THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 5.00 feet to a point on the North right-of-way line of 40th Avenue, as dedicated by 40th Avenue, Chambers Road - Pena Boulevard Subdivision, recorded May 6, 1997, at Reception Number 9700057406, said City and County of Denver Records;
3. THENCE South 89 degrees 52 minutes 06 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 250.09 feet;
4. THENCE South 89 degrees 52 minutes 04 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 23.63 feet;
THENCE North 00 degrees 07 minutes 54 seconds West, a distance of 464.23 feet to the true point of beginning, City and County of Denver, State of Colorado.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

Organization. Grantor is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Colorado. Grantor is duly authorized to transact business in all other states in which Grantor is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Grantor is doing business. Specifically, Grantor is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Grantor has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Grantor maintains an

EXHIBIT 5

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 1016                                                                                                                         Page 2

office at 5466 S. Hannibal Court, Centennial, CO 80015. Unless Grantor has designated otherwise in writing, the principal office is the office at which Grantor keeps its books and records including its records concerning the Collateral. Grantor will notify Lender prior to any change in the location of Grantor's state of organization or any change in Grantor's name. Grantor shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Grantor and Grantor's business activities.

**Authorization.** Grantor's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Grantor, do not require the consent or approval of any other person, regulatory authority, or governmental body, and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Grantor's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Grantor or (2) any law, governmental regulation, court decree, or order applicable to Grantor or to Grantor's properties. Grantor has the power and authority to enter into the Note and the Related Documents and to grant collateral as security for the Indebtedness. Grantor has the further power and authority to own and to hold all of Grantor's assets and properties, and to carry on Grantor's business as presently conducted.

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice. Grantor represents and warrants to Lender that Grantor has provided Lender with Grantor's correct Employer Identification Number. Grantor promptly shall notify Lender should Grantor apply for or obtain a new Employer Identification Number.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located. Collateral consisting of inventory and other goods is not currently located and, as long as this Agreement remains in effect, will not be kept in a field or public warehouse or with a bailee, and shall be kept only at locations approved by Lender. Grantor will not permit any of the Collateral to be incorporated in or placed upon any real (immovable) property in such a way that it becomes immobilized under applicable Colorado law. Upon Lender's request, Grantor shall cause any owners or mortgagees of the real property upon which any of the Collateral may be located to furnish to Lender waivers with respect to any rights in or to the Collateral.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Colorado, without Lender's prior written consent. If Grantor moves from Grantor's address shown above to another location within the same state, Grantor may move the Collateral to Grantor's new address, but only if Grantor gives Lender the new address in writing prior to Grantor's moving. In any event, Grantor agrees to keep Lender informed at all times of Grantor's current address. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Collateral Schedules and Locations.** As often as Lender shall require, and insofar as the Collateral consists of accounts, Grantor shall deliver to Lender schedules of such Collateral, including such information as Lender may require, including without limitation names and addresses of account debtors and agings of accounts. Insofar as the Collateral consists of equipment, Grantor shall deliver to Lender, as often as Lender shall require, such lists, descriptions, and designations of such Collateral as Lender may require to identify the nature, extent, and location of such Collateral. Such information shall be submitted for Grantor and each of its subsidiaries or related companies.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

EXHIBIT 5

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Repairs and Maintenance.** Grantor shall keep and maintain and shall cause others to keep and maintain the Collateral in good order, repair and merchantable condition. Grantor shall further make and/or cause all necessary repairs to be made to the Collateral, including the repair and restoration of any portion of the Collateral that may be damaged, lost or destroyed. In addition, Grantor shall not, without the prior written consent of Lender, make or permit to be made any alterations to any of the Collateral that may reduce or impair the Collateral's use, value or marketability. Furthermore, Grantor shall not, nor shall Grantor permit others to abandon, commit waste, or destroy the Collateral or any part or parts thereof. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, including without limitation all environmental laws, ordinances, rules and regulations, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $5,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Required Insurance.** So long as this Agreement remains in effect, Grantor shall, at its sole cost, keep and/or cause others, at their expense, to keep the Collateral constantly insured against loss by fire, by hazards included within the term "extended coverage," and by such other hazards (including flood insurance where applicable) as may be required by Lender.

**Insurance Proceeds.** Lender shall have the right to directly receive the proceeds of all insurance protecting the Collateral. In the event that Grantor should receive any such insurance proceeds, Grantor agrees to immediately turn over and to pay such proceeds directly to Lender. All insurance proceeds may be applied, at its sole option and discretion, and in such a manner as Lender may determine (after payment of all reasonable costs, expenses and attorneys' fees necessarily paid or fees necessarily paid or incurred by Lender in this connection), for the purpose of: (1) repairing or restoring the lost, damaged or destroyed Collateral; or (2) reducing the then outstanding balance of Grantor's Indebtedness.

Lender's receipt of such insurance proceeds and the application of such proceeds as provided herein shall not, however, affect the lien of this Agreement. Nothing under this section shall be deemed to excuse Grantor from its obligations promptly to repair, replace or restore any lost or damaged Collateral, whether or not the same may be covered by insurance, and whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Lender. Furthermore, unless otherwise confirmed by Lender in writing, the application or release of any insurance proceeds by Lender shall not be deemed to cure or waive any Event of Default under this Agreement. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be

EXHIBIT 5

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Prior Encumbrances.** To the extent applicable, Grantor shall fully and timely perform any and all of Grantor's obligations under any prior Encumbrances affecting the Collateral. Without limiting the foregoing, Grantor shall not commit or permit to exist any breach of or default under any such prior Encumbrances. Grantor shall further promptly notify Lender in writing upon the occurrence of any event or circumstances that would, or that might, result in a breach of or default under any such prior Encumbrance. Grantor shall further not modify or extend any of the terms of any prior Encumbrance or any indebtedness secured thereby, or request or obtain any additional loans or other extensions of credit from any third party creditor or creditors whenever such additional loan advances or other extensions of credit may be directly or indirectly secured, whether by cross-collateralization or otherwise, by the Collateral, or any part or parts thereof, with possible preference and priority over Lender's security interest. Grantor additionally agrees to obtain, upon Lender's request, and in form and substance as may then be satisfactory to Lender, appropriate waivers and subordinations of any lessor's liens or privileges, vendor's liens or privileges, purchase money security interests, and any other Encumbrances that may affect the Collateral at any time.

**Future Encumbrances.** Grantor shall not, without the prior written consent of Lender, grant any Encumbrance that may affect the Collateral, or any part or parts thereof, nor shall Grantor permit or consent to any Encumbrance attaching to or being filed against any of the Collateral in favor of anyone other than Lender. Grantor shall further promptly pay when due all statements and charges of mechanics, materialmen, laborers and others incurred in connection with the alteration, improvement, repair and maintenance of the Collateral, or otherwise furnish appropriate security or bond, so that no future Encumbrance may ever attach to or be filed against any Collateral. In the event that the Collateral or any part or parts thereof is and/or may be located in and/or on leased premises, Grantor shall promptly pay the full amount of such rental or lease payments whenever the same shall be due so that no lessor's lien or privilege may ever attach to or affect any of the Collateral with possible preference and priority over the lien of this Agreement. In the event that any of the Collateral is purchased or otherwise acquired by Grantor on a credit or deferred payment sales basis, Grantor shall promptly pay the full amount of the purchase or acquisition price of such Collateral so that no vendor's lien or privilege, or purchase money security interest, may ever attach to or be asserted against any of the Collateral with possible preference and priority over the lien of this Agreement. Grantor additionally agrees to obtain, upon request by Lender, and in form and substance as may then be satisfactory to Lender, appropriate waivers and/or subordinations of any lessor's liens or privileges, vendor's liens or privileges, purchase money security interests, and any other Encumbrances that may affect the Collateral at any time.

As long as this Agreement remains in effect, Grantor will not permit any levy, attachment or restraint to be made affecting any of the Collateral, or permit any notice of lien to be filed with respect to the Collateral or any part or parts thereof, or permit any receiver, trustee, custodian or assignee for the benefit of creditors to be appointed to take possession of any of the Collateral. Notwithstanding the foregoing, Grantor may, at its sole expense, contest in good faith by appropriate proceedings the validity or amount of any levy, attachment, restraint or lien filed against or affecting the Collateral, or any part or parts thereof; provided that (1) Grantor notifies Lender in advance of Grantor's intent to contest such a levy, attachment, restraint or lien, and (2) Grantor provides additional security to Lender, in form and amount satisfactory to Lender.

**Notice of Encumbrances.** Grantor shall immediately notify Lender in writing upon the filing of any attachment, lien, judicial process, claim, or other Encumbrance. Grantor additionally agrees to notify Lender immediately in writing upon the occurrence of any default, or event that with the passage of time, failure to cure, or giving of notice, might result in a default under any of Grantor's obligations that may be secured by any presently existing or future Encumbrance, or that might result in an Encumbrance affecting the Collateral, or should any of the Collateral be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than Lender.

**Books and Records.** Grantor will keep proper books and records with regard to Grantor's business activities and the Collateral in which a security interest is granted hereunder, in accordance with GAAP, applied on a consistent basis throughout, which books and records shall at all reasonable times be open to inspection and copying by Lender or Lender's designated agents. Lender shall also have the right to inspect Grantor's books and records, and to discuss Grantor's affairs and finances with Grantor's officers and representatives, at such reasonable times as Lender may designate.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. This includes making sure Lender is shown as the first and only security interest holder on the title covering the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**ADDITIONAL COVENANTS.** Grantor additionally agrees:

**No Settlement or Compromise.** Grantor will not, without the prior written consent of Lender, compromise, settle, adjust or extend payment under any of the Collateral.

**Books and Records.** Grantor will keep proper books and records with regard to Grantor's business activities and the Collateral, which books and records shall at all times be open to inspection and copying by Lender or its designated agent. Lender shall also have the right to

EXHIBIT 5

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

inspect Grantor's books and records, and to discuss Grantor's affairs and finances with Grantor at such reasonable times as Lender may designate.

**Aging of Accounts.** Grantor will periodically, at such intervals requested by Lender, furnish Lender with an aging of that part of the Collateral consisting of accounts, together with a certificate executed by an officer of Grantor, in such form and containing such representations and warranties regarding the accounts as Lender may reasonably require.

**Lock Box.** Grantor agrees that Lender may at any time require Grantor to institute procedures whereby the proceeds and/or payments of any accounts subject to this Agreement shall be paid by the debtors thereof under a lock box arrangement to Lender, or to Lender's agent, or to one or more financial institutions designated by Lender. Grantor further agrees that, if no Event of Default exists under this Agreement, any and all of such funds received under such a lock box arrangement shall, at Lender's sole election and discretion, either be: (a) paid and/or turned over to Grantor; (b) deposited into one or more accounts for the benefit of Grantor (which deposit accounts shall be subject to collateral assignment and pledge in favor of Lender as provided under this Agreement); (c) deposited into one or more accounts for the joint benefit of Grantor and Lender (which deposit accounts shall likewise be subject to assignment and pledge in favor of Lender as provided under this Agreement); (d) paid and/or turned over to Lender to be applied to the Indebtedness in such order and priority as Lender may determine within its sole discretion; or (e) any combination of the foregoing as Lender shall determine from time to time. Grantor further agrees that, should one or more Events of Default exist under this Agreement, any and all funds received under such a lock box arrangement shall be paid and/or turned over to Lender to be applied to principal, accrued interest, costs, expenses, attorneys' fees and other fees and charges under the Indebtedness, again in such order and priority as Lender may determine within its sole discretion.

**Notice to Obligors.** Upon request by Lender, Grantor immediately will notify individual obligors with regard to the Collateral, advising such obligors of the fact that Lender has been granted a security interest in their obligations. In the event that Grantor should fail to provide such notices for any reason upon Lender's request, Grantor agrees that Lender may forward appropriate notices to such obligors and debtors either in Lender's name or in Grantor's name.

**Additional Documents.** Grantor shall at any time, from time to time, one or more times, upon Lender's written request, execute and deliver such further documents and do any and all such further acts and things as Lender may reasonably request, within Lender's sole discretion, to effect the purposes of this Agreement.

**Verifications.** Grantor additionally agrees that Lender or Lender's agents may periodically contact individual debtors whose notes, instruments and chattel paper have been assigned and pledged under this Agreement in order to verify the amounts then owing under such obligations, to determine whether such debtors have any offsets or counterclaims against Grantor, and with respect to such other matters about which Lender may inquire.

**Notification of Lender.** Grantor will promptly deliver to Lender all written notices, and will promptly give Lender written notice of any other notices received by Grantor with respect to the Collateral and Rights, and Lender will promptly give like notice to Grantor of any such notices received by Lender or its nominee.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf, or made by Guarantor, or any other guarantor, endorser, surety, or accommodation party, under this Agreement or the Related Documents in connection with the obtaining of the Indebtedness evidenced by the Note or any security document directly or indirectly securing repayment of the Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.** Any execution or attachment is levied against the Collateral, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

EXHIBIT 5

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Change in Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Collateral such that the present or intended use of the Collateral, as specified in the Related Documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Collateral.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Grantor and the failure by Grantor to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor, or any other guarantor, endorser, surety, or accommodation party of any of the Indebtedness or Guarantor, or any other guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Colorado Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon ex parte application and without notice, notice being expressly waived.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**CO-LENDER SUPPLEMENTAL PROVISION .** Grantor acknowledges that a portion of that certain loan made to Grantor in the total amount of $10,200,000.00 (the "Loan") secured hereby was funded by Aileron Investment Management, LLC, having an address at 3401 W. Cypress

EXHIBIT 5

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 1016                                                                                                                                                 Page 7

Street, Suite 101, Tampa, Florida 33607 ("Aileron"), which interest is represented by a certain Note A dated as of the date hereof executed by Grantor in connection herewith in the amount of $5,700,000.00. Grantor acknowledges that Aileron has an undivided interest in the Loan and the rights granted to Lender herein. Grantor further acknowledges that Aileron is deemed to be a "Lender" under this agreement and the Related Documents executed in connection herewith and shall have all the rights associated therewith including the right to pursue collection of the Loan from Grantor and exercise the rights granted to Lender hereunder in its own name and to receive notices required hereunder at the above address.

**COUNTERPARTS; TELECOPIED SIGNATURES.** This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

**CASH PROCEEDS.** The Cash Proceeds shall be released and disbursed in increments/draws after completion and opening/commencement of operation of the Project as may be required from time to time for working capital or other Project needs including PIP Costs or Post Closing Liquidity requirements (as each is further discussed in the Loan Agreement) or debt service payments as may be approved by Lender in its reasonable discretion.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

    **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

    **Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's reasonable costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the reasonable costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

    **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

    **Governing Law. With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Collateral, this Agreement will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of Colorado. In all other respects, this Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Agreement has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of California.**

    **Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

    **Non-Liability of Lender.** The relationship between Grantor and Lender created by this Agreement is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Grantor. Grantor is exercising Grantor's own judgment with respect to Grantor's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Grantor of any matter with respect to Grantor's business. Lender and Grantor intend that Lender may reasonably rely on all information supplied by Grantor to Lender, together with all representations and warranties given by Grantor to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

    **Notice of Lender's Breach.** Grantor must notify Lender in writing of any breach of this Agreement or the Related Documents by Lender and any other claim, cause of action or offset against Lender within thirty (30) days after the occurrence of such breach or after the accrual of such claim, cause of action or offset. Grantor waives any claim, cause of action or offset for which notice is not given in accordance with this paragraph. Lender is entitled to rely on any failure to give such notice.

    **Indemnification of Lender.** Grantor agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorneys' fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted Lender under this, as well as by: (1) the ownership, use, operation, construction, renovation, demolition, preservation, management, repair, condition, or maintenance of any part of the Collateral; (2) the exercise of any of Grantor's rights collaterally assigned and pledged to Lender hereunder; (3) any failure of Grantor to perform any of its obligations hereunder; and/or (4) any failure of Grantor to comply with the environmental and ERISA obligations, representations and warranties set forth herein. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder. Grantor's indemnity obligations under this section shall not in any way be affected by the presence or absence of covering insurance, or by the amount of such insurance or by the failure or refusal of any insurance carrier to perform any obligation on its part under any insurance policy or policies affecting the Collateral and/or Grantor's business activities. Should any claim, action or proceeding be made or brought against Lender by reason of any event as to which Grantor's indemnification obligations apply, then, upon Lender's demand, Grantor, at its sole cost and expense, shall defend such claim, action or proceeding in Grantor's name, if necessary, by the attorneys for Grantor's insurance carrier (if such claim, action or proceeding is covered by insurance), or otherwise by such attorneys as Lender shall approve. Lender may also engage its own attorneys at its reasonable discretion to defend Grantor and to assist in its defense and Grantor agrees to pay the fees and disbursements of such attorneys.

    **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

EXHIBIT 5

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Sole Discretion of Lender.** Whenever Lender's consent or approval is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of Lender and Lender's decision shall be final and conclusive.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury. To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means WPB Hospitality, LLC, a Colorado limited liability company and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Encumbrance.** The word "Encumbrance" means any and all presently existing or future mortgages, liens, privileges and other contractual and statutory security interests and rights, of every nature and kind, whether in admiralty, at law, or in equity, that now and/or in the future may affect the Collateral or any part or parts thereof.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means WPB Hospitality, LLC, a Colorado limited liability company.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness, and, in each case, Grantor's successors, assigns, heirs, personal representatives, executors and administrators of any guarantor, surety, or accommodation party.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor, or any other guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

EXHIBIT 5

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

| Loan No: 1016 | Page 9 |
|---|---|

**Lender.** The word "Lender" means American Lending Center, LLC, a California limited liability company, its successors and assigns.

**Note.** The word "Note" means the Notes dated as of the date herein, in the original amounts of $5,700,000.00 given to Aileron Investment Management, LLC and $4,500,000.00 given to American Lending Center, LLC (Promissory Notes A and Promissory Note B, respectively) in the total amount of $10,200,000.00 and executed by Borrower together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rights.** The word "Rights" means individually, collectively and interchangeably any and all of Grantor's additional rights granted and pledged to Lender as provided under this Agreement.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 31, 2015.

GRANTOR:

WPB HOSPITALITY, LLC, A COLORADO LIMITED LIABILITY COMPANY

By: _Wanda S. Bertoia_ _____
Wanda S. Bertoia, the Sole Member of WPB
Hospitality, LLC, a Colorado limited liability company

EXHIBIT 5

EXHIBIT 6



EXHIBIT 6







EXHIBIT 6





EXHIBIT 6



EXHIBIT 6



EXHIBIT 6



Beneficiary Form

# Beneficiary Form

## Reference Number 20180726-00013210 is Pending Approval.

Branch  001:6762606   HAVANA GARDENS

| | | |
|---|---|---|
| Payment Amount | 556,099.98 USD  Rate | Contract Number |
| Debit Amount | 556,099.98 USD | Charge Party    None |

Send Date  26JUL2018        Value Date  26JUL2018

Consumer X-Border   Not D-F

## Debit Party
D/▮▮▮▮▮
ALPINE HOSPITALITY, INC.
6210 TOWER RD
DENVER, CO 80249

## Beneficiary
Is Beneficiary a Bank? No
/ACCOUNT NUMBER ▮▮▮▮▮
CITY AND COUNTY OF DENVER-
PUBLIC TRUSTEE
201 W COLFAX AVE DEPT 101
DENVER, CO 80202

## Beneficiary's Bank
A/▮▮▮▮▮
JP MORGAN CHASE BANK
NEW YORK
NEW YORK

## Originator to Beneficiary Information
CURE STATEMENT

7/26/2018

EXHIBIT 7

| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY, COLORADO**<br><br>Court Address:    1437 Bannock Street, Room 256<br>                           Denver, CO 80202<br><br>Phone Number:    720-865-8301 | <span style="color:red">**GRANTED BY COURT**<br>**09/21/2018**</span><br>DATE FILED: September 21, 2018 1:31 PM<br>CASE NUMBER: 2018CV31958<br><br>Robert Mcgahey<br>Judge<br>▲  COURT USE ONLY  ▲ |
| **IN THE MATTER OF: THE APPLICATION OF AMERICAN LENDING CENTER, LLC** for an order authorizing the Public Trustee of the County of Denver, State of Colorado, to sell certain real estate under a power of sale contained in a deed of trust. | Case Number:  2018CV031958<br><br>Div.: 414 |
| <div align="center">**ORDER AUTHORIZING SALE**</div> | |

THIS MATTER, having come before the Court on Applicant/Petitioner's Verified Motion for Order Authorizing a Foreclosure Sale under C.R.C.P. 120, and in accordance with this Court's Findings of Facts and Conclusions of Law entered herein, and being fully advised in the premises,

THE COURT FINDS:

1. The venue is proper and the Applicant/Petitioner is entitled to an Order Authorizing Sale;

2. That there is reasonable probability that a default justifying the sale has occurred due to a failure to adhere to construction obligations as required by the Deed of Trust, in particular, to complete construction by a date certain;

3. That an Order Authorizing Sale is otherwise proper under Servicemembers Civil Relief Act of 2003, as amended; and

4. That the Applicant/Petitioner has complied with the provisions of Rule 120 of the Colorado Rules of Civil Procedure.

IT IS ORDERED that the Public Trustee of the County of Denver, State of Colorado (the "Public Trustee"), pursuant to the provisions of the Deed of Trust recorded January 8, 2016, at Reception No. 2016002425, in the Office of the Clerk and Recorder of the County of Denver, State of Colorado, is authorized to sell the following real property:

<div align="center">SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN.</div>

Street Address:  16161 E. 40th Avenue, Denver, Colorado  80239.

4810-5929-5071.1

EXHIBIT 8

IT IS FURTHER ORDERED that the cure funds in the amount of $556,099.98 submitted to the Public Trustee on July 27, 2018 by WPB Hospitality, LLC (Receipt #19184), shall be immediately released and delivered to Petitioner, care of its counsel (Moye White LLP), and that the foreclosure sale shall proceed as though a cure of the monetary default did not take place.

IT IS FURTHER ORDERED that a return of such sale be made to this Court for its approval.

SIGNED this _____ day of _____, 2018.

BY THE COURT:

_____
District Court Judge

(Public Trustee Sale No. 2018-000146, County of Denver, State of Colorado)

EXHIBIT 8

## EXHIBIT A

### Legal Description

A parcel of land being a portion of Plot 1, Block 1, Gateway Park IV – Denver Filing No. 7, being more particularly described as follows:

COMMENCING at the northwest corner of said Plot 1;

THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 295.63 feet to the true point of beginning;

THENCE North 89 degrees 52 minutes 06 seconds East, along the North line of said Plot 1, a distance of 396.64 feet to the northeast corner of said Plot 1;

THENCE the following three (3) course along the East line of said Plot 1:

1.  THENCE South 10 degrees 26 minutes 16 seconds West, a distance of 95.82 feet to a point of curve;
2.  THENCE along the arc of a curve to the left, having a central angle of 10 degrees 34 minutes 10 seconds, a radius of 315.00 feet and an arc length of 58.11 feet;
3.  THENCE South 00 degrees 07 minutes 54 seconds East , a distance of 307.25 feet to the southeast corner of said Plot 1;

THENCE the following four (4) courses along the South line of said Plot 1:

1.  THENCE South 89 degrees 52 minutes 06 seconds West, a distance of 100.00 feet;
2.  THENCE South 00 degrees 07 minutes 54 seconds East, a distance of 5.00 feet to a point on the North right-of-way line of 40th Avenue, as dedicated by 40th Avenue, Chamber Road – Pena Boulevard Subdivision, recorded May 6, 1997, at Reception Number 9700057406, said City and County of Denver Records;
3.  THENCE South 89 degrees 52 minutes 06 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 250.09 feet;
4.  THENCE South 89 degrees 52 minutes 04 seconds West, along the North right-of-way line of said 40th Avenue, a distance of 23.63 feet;

THENCE North 00 degrees 07 minutes 54 seconds West, a distance of 464.23 feet to the true point of beginning, City and County of Denver, State of Colorado.

EXHIBIT 8

Back | Print 🖨

### 2018-000146 - AF#: WPB HOSPITALITY, LLC LF: MOYE-W Borrower: Defendant Not Entered

| SUMMARY | | | |
|---|---|---|---|
| Judge: | Case Type: FORECLOSURE | Status: ON HOLD | |
| Case Number: 2018-000146 | Uniform Case Number: 2018000146 | | |
| Clerk File Date: 4/4/2018 | Status Date: 4/4/2018 | | |
| SAO Case Number: | Total Fees Due: 0.00 | | |
| Agency: | Agency Report #: | Custody Location: | |

| PARTIES | |
|---|---|
| **TYPE** | **PARTY NAME**                                                         **ATTORNEY** |
| FORECLOSURE ATTORNEY | LAIRD, DAVID A |
| GRANTOR | WPB HOSPITALITY, LLC, A COLORADO LIMITED LIABILITY COMPANY |
| ORIGINAL BENEFICIARY | AMERICAN LENDING CENTER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| CURRENT BENEFICIARY | AMERICAN LENDING CENTER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| PUBLISHER | DENVER POST |
| MAILING LIST RECIPIENT | AMERICAN LENDING CENTER, LLC |
| MAILING LIST RECIPIENT | JOHNSON, DEBRA |
| MAILING LIST RECIPIENT | OCCUPANT |
| MAILING LIST RECIPIENT | DAVID LAIRD, ESQ. |
| MAILING LIST RECIPIENT | WPB HOSPITALITY, LLC |
| MAILING LIST RECIPIENT | WPB HOSPITALITY, LLC |
| MAILING LIST RECIPIENT | LESSEE |
| MAILING LIST RECIPIENT | WPB HOSPITALITY, LLC |
| MAILING LIST RECIPIENT | AILERON INVESTMENT MANAGEMENT, LLC |
| MAILING LIST RECIPIENT | BING SELLERS |
| MAILING LIST RECIPIENT | BLACKHALL, P.C. |
| MAILING LIST RECIPIENT | KUMAR CONSTRUCTION MANAGEMENT |
| MAILING LIST RECIPIENT | URBAN WEST CONSTRUCTION LLC |
| MAILING LIST RECIPIENT | KUMAR CONSTRUCTION MANAGEMENT |
| MAILING LIST RECIPIENT | RIO GRANDE CO. |
| MAILING LIST RECIPIENT | KUMAR CONSTRUCTION MANAGEMENT |
| MAILING LIST RECIPIENT | DAVID B. LAW, ESQ. ATTORNEY FOR RIO GRANDE CO. |
| MAILING LIST RECIPIENT | O'BRIEN CONCRETE PUMPING-COLORADO, INC. |
| MAILING LIST RECIPIENT | WASTE CONNECTIONS OF COLORADO INC. |
| MAILING LIST RECIPIENT | DAVID B. LAW, ESQ. ATTORNEY FOR O'BRIEN CONCRETE-PUMPING-COLORADO,INC. |
| MAILING LIST RECIPIENT | UNITED RENTALS (NORTH AMERICA), INC. |
| MAILING LIST RECIPIENT | KUMAR CONSTRUCTION MGMT INC |
| MAILING LIST RECIPIENT | SUMMIT SERVICES GROUP LLC |
| MAILING LIST RECIPIENT | KUMAR CONSTRUCTION MANAGEMENT, INC. |
| MAILING LIST RECIPIENT | METRO BUILDING PRODUCTS, INC. |
| MAILING LIST RECIPIENT | JEAN C. ARNOLD, ESQ. |
| MAILING LIST RECIPIENT | REDD IRON, INC. |
| MAILING LIST RECIPIENT | SUMMIT SERVICES GROUP LLC |
| MAILING LIST RECIPIENT | HD SUPPLY CONSTRUCTION SUPPLY, LTD. D/B/A HD SUPPLY CONSTRUCTION & INDUSTRIAL-WHITE CAP |
| MAILING LIST RECIPIENT | ALPINE HOSPITALITY, INC. |
| MAILING LIST RECIPIENT | TETRA TECH, INC. |
| MAILING LIST RECIPIENT | DENVER CITY ATTORNEY |
| MAILING LIST RECIPIENT | DENVER CLERK AND RECORDER |
| MAILING LIST RECIPIENT | BERTOIA, WANDA S. |
| MAILING LIST RECIPIENT | DENVER CITY COUNCIL |
| MAILING LIST RECIPIENT | DAVID B. LAW, ESQ. ATTORNEY FOR HD SUPPLY CONSTRUCTION SUPPLY, LTD. D/B/A HD SUPPLY CONSTRUCTION & INDUSTRIAL - WHITE CAP |

**EXHIBIT 9**

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| MAILING LIST RECIPIENT | DENVER COMMUNITY PLANNING AND DEVELOPMENT | |
| MAILING LIST RECIPIENT | DENVER COMMUNITY PLANNING AND DEVELOPMENT | |
| INTENT TO CURE FILER | BRETT PAYTON, ESQ. | |
| ITC TO NOTIFY | WPB HOSPITATLITY, LLC | |

**EVENTS**

| DATE | EVENT | JUDGE | LOCATION | RESULT |
|---|---|---|---|---|
| 10/4/2018 10:00 AM | PropertySale | PUBLIC TRUSTEE OF THE CITY AND COUNTY OF DENVER | REAL AUCTION | ON HOLD |
| 8/9/2018 10:00 AM | PropertySale | PUBLIC TRUSTEE OF THE CITY AND COUNTY OF DENVER | REAL AUCTION | CONTINUED |
| 8/2/2018 10:00 AM | PropertySale | PUBLIC TRUSTEE OF THE CITY AND COUNTY OF DENVER | REAL AUCTION | CONTINUED - LACK OF CURE STATEMENT |

**CASE HISTORY**

| CASE NUMBER | CHARGE DESCRIPTION | CASE STATUS | DISPOSITION | OUTSTANDING AMOUNT | NEXT EVENT | ALERTS |
|---|---|---|---|---|---|---|
| | | | No Additional Cases | | | |

**CASE DOCKETS**

| IMAGE | DATE | ENTRY |
|---|---|---|
| 10 | 10/3/2018 | BANKRUPTCY |
| 2 | 10/2/2018 | BID SHEET |
| 1 | 10/1/2018 | STATEMENT OF ACTIVITY SNAPSHOT |
| 3 | 9/27/2018 | ORDER AUTHORIZING SALE |
| 1 | 9/24/2018 | STATEMENT OF ACTIVITY SNAPSHOT |
| 1 | 7/27/2018 | PAYMENT $556,099.98 RECEIPT #19284 |
| 2 | 7/13/2018 | CURE STATEMENT--CORRECTED CURE STATEMENT--- |
| 1 | 7/13/2018 | STATEMENT OF ACTIVITY SNAPSHOT |
| 1 | 7/10/2018 | PROOF OF PUBLICATION |
| 2 | 6/20/2018 | CURE STATEMENT |
| 1 | 6/20/2018 | STATEMENT OF ACTIVITY SNAPSHOT |
| 3 | 6/4/2018 | AMENDED MAILING LIST |
| 1 | 6/4/2018 | AMENDED CERTIFICATE OF MAILING |
| 1 | 6/4/2018 | COMBINED NOTICE (AMENDED) |
| 15 | 5/29/2018 | MISCELLANEOUS |
| 1 | 5/25/2018 | NOTE ORIGINAL -- ALLONGE TO PROMISSORY NOTE A -- |
| 1 | 5/16/2018 | GALLEY |
| 2 | 5/15/2018 | PUBLISHER NOTICE OF SALE |
| 3 | 4/6/2018 | MAILING LIST |
| 1 | 4/6/2018 | CERTIFICATE OF MAILING |
| 1 | 4/6/2018 | COMBINED NOTICE |
| 3 | 4/5/2018 | NED - RECORDED (4/5/2018 10:52 AM / RECEPTION #: 2018039950) |
| 1 | 4/4/2018 | RECEIPT # 16863 MODIFIED: PAYMENT $3,187.50 |
| 1 | 4/4/2018 | PAYMENT $3,187.50 RECEIPT #16863 |
| 3 | 4/4/2018 | MAILING LIST |
| 3 | 4/4/2018 | STATEMENT OF CURRENT OWNERSHIP |
| 13 | 4/4/2018 | MISCELLANEOUS--CN-- |
| 13 | 4/4/2018 | DEED OF TRUST |
| 4 | 4/4/2018 | NOTE ORIGINAL--B-- |
| 4 | 4/4/2018 | NOTE ORIGINAL--A-- |
| 2 | 4/4/2018 | COVERSHEET |
| 3 | 4/4/2018 | NED |
| 1 | 4/4/2018 | LEGAL DESCRIPTION |

EXHIBIT 9

**Fill in this information to identify your case**

**UNITED STATES BANKRUPTCY COURT DISTRICT OF COLORADO**

| Debtor 1: | WPB Hospitality, LLC | Case #: | 18-18636-EBB |
|---|---|---|---|
| Debtor 2: | | Chapter: | 11 |

## Local Bankruptcy Form 4001-1.1
## Notice of Motion for Relief from Stay and Opportunity for Hearing

Complete applicable sections.

**Part 1**  **Objection Deadline**

Objection deadline: **November 8, 2018**.

**Part 2**  **Notice**

NOTICE IS HEREBY GIVEN that a Motion for Relief from Stay has been filed, a copy of which is attached hereto.

A hearing on the Motion has been has been set for **November 15, 2018,** at **1:30 p.m.** at the U.S. Bankruptcy Court, U.S. Custom House, 721 19th Street, Courtroom **F**, Fifth Floor, Denver, Colorado 80202.  The hearing will be conducted in accordance with the provisions of L.B.R. 4001-1.

If you desire to oppose the Motion, you must file with this court a written objection to the Motion on or before the objection deadline stated above and serve a copy upon movant's attorney, whose address is listed below.

If you file an objection, you are required to comply with L.B.R. 4001-1 regarding hearing procedures, including (i) the timely submission and exchange of witness lists and exhibits and (ii) attendance at the above-scheduled hearing in person or through counsel, if represented.

If you fail to file an objection, the scheduled hearing will be vacated, and an order granting the relief requested may be granted without further notice to you.

**Part 3**  **Signature of Movant's Attorney or Movant (if unrepresented)**

Dated: October 18, 2018

s/ *David A. Laird*
David A. Laird, #31067
Moye White LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202
Email: david.laird@moyewhite.com
Phone:  (303) 292-2900
Fax:     (303) 292-4510

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2018, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of such filing to all parties receiving electronic notice from the Court's CM/ECF system, and *via* first class mail on the parties identified below and all parties identified on the attached Debtor's Creditors' Matrix as of October 18, 2018.

*s/ Lisa Oliver*

**Debtor**
**WPB Hospitality, LLC**
5466 S Hannibal Ct
Aurora, CO 80015-4282
ARAPAHOE-CO
Tax ID / EIN: 27-0223459

represented by **Arthur Lindquist-Kleissler**
950 S. Cherry St.
Ste. 418
Denver, CO 80246
303-691-9774
Fax : 303-200-8994
Email: Arthuralklaw@gmail.com

*U.S. Trustee*
**US Trustee**
Byron G. Rogers Federal Building
1961 Stout St.
Ste. 12-200
Denver, CO 80294
303-312-7230

represented by **Alan K. Motes**
Byron G. Rogers Federal Building
1961 Stout St.
Ste. 12-200
Denver, CO 80294
303-312-7999
Email: Alan.Motes@usdoj.gov

**Creditor's Matrix**

Bing Sellers
3879 E. 120th Ave. #345
Thornton, CO  80233-1658

Colorado Dept. of Revenue
Attn:  Bankruptcy Department
1375 Sherman St.
Denver, CO  80261-3000

U.S. Bankruptcy Court
US Custom House
721 19th Street
Denver, CO  80202-2508

Colorado Department of Revenue
1375 Sherman St., Room 504
Attn:  Bankruptcy Unit
Denver, CO  80261-3000

IRS
P.O. Box 7346
Philadelphia, PA  19101-7346

Alpine Hospitality
6210 Tower Rd.
Denver, CO  80249-6703

HD Supply
10000 E. 56th Ave., Unit 130
Denver, CO  80238-3899

O'Brien Concrete Pumping Colorado
4388 S. Windmere St.
Englewood, CO  80110-5539

Colorado Attorney General
1300 N. Broadway, Fl. 10
Denver, CO  80203-2104

Rio Grande Company
201 Santa Fe Dr.
Denver, CO  80223-1328

Securities and Exchange Commission
Central Regional Office
1961 Stout St., Ste. 1700
Denver, CO  80294-1700

Denver County Public Trustee
201 W. Colfax Ave.
Denver, CO  80202-5330

Summit Services Group, LLC
15690 E. 53rd Ave.
Aurora, CO  80011

US Trustee
Byron G. Rogers Federal Building
1961 Stout St., Ste. 12-200
Denver, CO  80294-6004

Metro Building Products, Inc.
2115 S. Valentia St.
Denver, CO  80231-3324

Urban West Construction, LLC
3155 E. 104th Ave., Unit 8E
Thornton, CO  80233-4215

Arthur Lindquist-Kleissler
950 S. Cherry St., Ste. 418
Denver, CO  80246-2662

Redd Iron, Inc.
Atkins, David
10421 E. 106th Ave.
Brighton, CO  80601-7177

Aileron Investment Management, LLC
3410 W. Cypress St., Ste 101
Tampa, FL  33607-5008

United Rentals North Am. Inc.
6125 Lakeview Rd., Ste 300
Charlotte, NC  28269-2616

Securities and Exchange Commission
Midwest Regional Office
175 W. Jackson Blvd., Ste 900
Chicago, IL  60604-2815

City and County of Denver
Treasury Division
P.O. Box 17420
Denver, CO  80217-0420

WPB Hospitality, LLC
5466 S. Hannibal Ct.
Aurora, CO  80015-4282

Am Lending Center, LLC
1 World Trade Ctr., Ste 1180
Long Beach, CA  90831-0023

Moye White LLP
1400 16th St., 6th Fl.
Denver, CO  80202